En el Tribunal Supremo de Puerto Rico

| | |
|---|---|
| MANUEL HERNANDEZ HERNANDEZ <br>     PETICIONARIO <br><br>     .V <br><br> ANGEL ESPINOSA Y OTROS <br><br>     Recurridos | Certiorari <br><br> TSPR98-40 |

Número del Caso: AC-96-53

Abogados Parte Peticionaria: Lic. Angel M. Bonnet Rosario

Abogados Parte Recurrida: Lic. Julio Nigaglioni Arrache
Lic. Eric R. Ronda Del Toro
(Cancio, Nadal, Rivera & Díaz)

Abogados Parte Interventora:

Tribunal de Instancia: Superior, Arecibo

Juez del Tribunal de Primera Instancia: Hon. Marcos T. Calderón Vázquez

Tribunal de circuito de Apelaciones: Circuito Regional de Arecibo y Utuado

Juez Ponente: Hon. Salas Soler

Fecha: 4/3/1998

Materia: Despido Ilegal, Reclamación de Salarios y Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Manuel Hernández Hernández

    Peticionario


      v.                AC-96-53


Angel Espinosa y otros

    Recurridos


Opinión del Tribunal emitida por la Juez Asociada señora NAVEIRA DE RODON.


San Juan, Puerto Rico, a 3 de abril de 1998

Nuevamente nos corresponde interpretar las disposiciones d[e] la Ley Núm. 2 de 17 de octubre de 1961, según enmendada, 3[2] L.P.R.A. secs. 3118-3133. En particular, debemos clarificar e[l] significado del término **"distrito judicial"** de acuerdo con e[l] esquema de la Sec. 3 de dicha ley, 32 L.P.R.A. sec. 3120.


I.    <u>LOS HECHOS</u>

El 4 de octubre de 1995, Manuel Hernández Hernández (en adelante obrero peticionario) presentó en la Sala Superior de Arecibo del Tribunal de Primera Instancia una querella al ampar[o] del procedimiento sumario establecido por la

Ley Núm. 2, supra. Incluyó como querellados al Sr. Angel Espinosa, la esposa de éste identificada como Fulana de Tal y la sociedad legal de gananciales compuesta por ambos, h/n/c Vaquería Espinosa (en adelante recurridos). Alegó en síntesis: que había trabajado como ordeñador para los recurridos desde el mes de febrero de 1989 hasta el 15 de octubre de 1994; que sus servicios fueron contratados sin especificar un límite de tiempo y que entre sus tareas se encontraba la de suministrar medicamentos al ganado; que recibía un salario de cinco dólares ($5) por hora; que había sido despedido injustificadamente; que mientras estuvo empleado trabajó horas extras sin recibir paga alguna; que no se le permitió tomar su hora de almuerzo; que tampoco se le permitió disfrutar de sus vacaciones regulares; y que nunca se le pagó el bono de navidad.

El obrero peticionario solicitó remedios al amparo de la Ley Núm. 379 de 15 de mayo de 1948, según enmendada, 29 L.P.R.A. sec. 271 et seq.; la Ley Núm. 96 de 26 de junio de 1956, según enmendada, 29 L.P.R.A. sec. 245 et seq.; el Art. 2 de la Ley Núm. 115 de 20 de diciembre de 1991, 29 L.P.R.A. sec. 194a(c); la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185a et seq. y la Ley Núm. 148 de 30 de junio de 1969, según enmendada, 29 L.P.R.A. sec. 501 et seq. Pidió específicamente que se ordenara su reinstalación al empleo y que se le hicieran los pagos correspondientes por concepto de mesada, horas extras trabajadas y no compensadas a tiempo doble, horas de tomar alimentos, vacaciones, bono de navidad y las penalidades aplicables. Estimó que todo lo anterior totalizaba setenta y siete mil seiscientos veinte dólares ($77,620), más quince mil dólares ($15,000) por concepto de costas, gastos y honorarios de abogado.

Los recurridos fueron notificados de la querella el 2 de noviembre de 1995. La sociedad de bienes gananciales h/n/c Vaquería Espinosa y Angel Espinosa fueron notificados en el municipio de Camuy, mientras

que la Sra. Nelva Avila en el municipio de Hatillo.[1]  A todos se les advirtió que de no contestar dicha querella dentro del término de diez (10) días contados desde su notificación, se procedería a dictar sentencia en su contra sin más citarle ni oírle.

El 14 de noviembre de 1995, once (11) días después de notificada la querella y sin que los recurridos hubiesen contestado, el obrero peticionario solicitó que se dictara sentencia en rebeldía a su favor. El 17 de noviembre de 1995 el tribunal de instancia anotó la rebeldía a los recurridos. Alegadamente, ese mismo día fue recibida en el tribunal la contestación a la querella suscrita por Angel Espinosa y la sociedad legal de gananciales h/n/c Vaquería Espinosa.  La orden del tribunal anotando la rebeldía fue notificada a las partes el 28 de noviembre de 1995.[2]

Posteriormente, el 4 de diciembre de 1995, treinta y dos (32) días después de notificados, la representación legal de los recurridos interpuso un escrito titulado "Moción Solicitando Reconsideración o Relevo de Anotación de Rebeldía" acompañado de una declaración jurada suscrita por el Lcdo. Eric R. Ronda del Toro.  En esencia solicitó que se relevara a sus representados de la rebeldía.  En aras de justificar su petición, adujo como principal argumento que suscribió y envió la contestación a la querella el 11 de noviembre de 1995, o sea, dentro del término establecido por ley.  Por su parte, en la declaración jurada señaló, que la querella fue recibida en su oficina el 9 de noviembre de 1995 y que por problemas personales no pudo enviar la

---

[1] La sociedad de bienes gananciales h/n/c Vaquería Espinosa fue notificada dos (2) veces: a través de Angel Espinosa en Camuy, y a través de su esposa Nelva Avila en Hatillo.  Cabe señalar que, aunque la esposa del Sr. Angel Espinosa fue identificada como Fulana de Tal en la querella y que la misma nunca se enmendó para incluir el nombre correcto, ésta sí fue notificada de tal querella por su nombre propio, Nelva Avila.

[2] Es menester aclarar que la señora Nelva Avila no compareció específicamente.  Sin embargo, la querella está dirigida contra el patrono del obrero reclamante, Manuel Hernández Hernández y como bien se desprende de la misma, el patrono es la sociedad legal de gananciales compuesta obviamente por los esposos Espinosa Avila.

contestación antes del 11 de noviembre.[3] Expuso, sin mayor explicación, que para contestar la querella era menester llevar a cabo una investigación de los hechos y del derecho aplicable. Finalmente, adujo que desconocía las razones por las cuales la contestación a la querella no fue recibida en el tribunal hasta el día 17 de noviembre de 1995.

Luego de varios trámites procesales, el 2 de enero de 1996 el tribunal de instancia denegó la moción. Esta orden fue notificada el 9 de enero. Al día siguiente, dicho tribunal dictó una sentencia en rebeldía declarando con lugar la querella.[4] Condenó a los recurridos a reponer en su empleo al obrero peticionario y a satisfacerle la cantidad de doscientos mil cien dólares ($200,100) por concepto de mesada, horario extraordinario, horas de alimentos, vacaciones, penalidades y honorarios de abogado. Además, ordenó el pago de salarios a razón de cuarenta dólares ($40) por cada día transcurrido desde la fecha de la presentación de la querella, el 4 de octubre de 1995, hasta que el obrero peticionario fuera repuesto en su empleo, más el duplo correspondiente por concepto de penalidad.

Inconforme con esta determinación, el 29 de enero de 1996, el patrono recurrido interpuso un recurso de _certiorari_ ante el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito).[5] El 5 de

---

[3] El licenciado Ronda del Toro alegó que el 9 de noviembre de 1995 se encontraba con su hija, que tuvo que ser operada de emergencia, en la Clínica Las Américas.

[4] Como cuestión de hecho el tribunal concluyó que la querella no fue contestada, ni se presentó moción de prórroga _jurada_ dentro del término de diez (10) días dispuesto por la Ley Núm. 2, supra.

[5] A dicho recurso se le asignó el Núm. KLCE-96-00083. Este fue el segundo recurso presentado sobre el mismo caso, ya que, de la orden reiterando la anotación de rebeldía, los recurridos acudieron al Tribunal de Circuito y también presentaron un recurso de _certiorari_, al que se le asignó el número KLCE 96-00058. En ambas peticiones el patrono recurrido discutió idénticos errores con la sola excepción de que en el recurso KLCE-96-00083 incluyó como error que el foro de instancia dictó una sentencia en rebeldía por más del doble de la cuantía original reclamada en la querella.

Los errores señalados en el recurso KLCE-96-00083 fueron los siguientes:
1. Erró el Tribunal de Primera Instancia al mantener una anotación de rebeldía de los aquí comparecientes, a pesar [de] que se radicó la Contestación a la Querella, tan solo

febrero de 1996, el Tribunal de Circuito ordenó la paralización de los efectos de la sentencia. Además, ordenó al obrero peticionario mostrar causa por la cual no se debía expedir el auto solicitado y dejar sin efecto la anotación de rebeldía.

En cumplimiento con lo anterior, el peticionario compareció y expresó su posición en torno a las dos (2) peticiones de certiorari interpuestas por los recurridos. Dos (2) días más tarde, el Tribunal de Circuito consolidó los recursos y los acogió como una apelación.

El 20 de marzo de 1996, dicho tribunal dictó una sentencia mediante la cual revocó el dictamen del foro de instancia. Resolvió que no procedía la anotación de rebeldía contra los recurridos. Dispuso que el plazo que éstos tenían para contestar la querella no era el de diez (10), sino el de quince (15) días, ya que ésta había sido notificada en un distrito judicial distinto al que fue presentada. Modificó, además, la cuantía por concepto de horas extras y penalidades otorgada por el foro de instancia al obrero peticionario.[6] Finalmente, ordenó la devolución del caso para que dicho foro resolviera conforme a lo dictaminado en su sentencia.

Por su inconformidad con esta decisión y luego de haber sido denegada una solicitud de reconsideración, el obrero peticionario acudió ante nos mediante recurso de apelación. Alegó la comisión de los siguientes errores:

> 1. Erró el Tribunal de Circuito de Apelaciones al resolver, en forma contraria a la ley, que el

---

> 4 días luego del término dispuesto en la ley para contestar en estos casos y se dió [sic] una explicación bajo juramento para esa tardanza.

> 2. Erró el Trinunal [sic] de Primera Instancia al dictar una Sentencia en rebeldía por más del doble de la cuantía original notificada a la parte querellada, sin que tampoco existiera declaración alguna del querellante.

[6] La modificación de esta cuantía por el Tribunal de Circuito resultaba prematura a la luz de su determinación de que no procedía la anotación de rebeldía, sino la devolución del caso para que se contestase la querella y continuaran los procedimientos al amparo de la Ley Núm. 2, supra.

término para contestar la querella en este caso era de quince (15) y no de diez (10) días como dispone la ley.

2. Erró el Tribunal de Circuito de Apelaciones al considerar y resolver sobre el contenido de la sentencia emitida por el Tribunal Superior[,] a pesar de que en la Orden para Mostrar Causa exigía únicamente que se expusieran razones por las cuales no debía dejarse sin efecto la anotación de rebeldía.

3. Erró el Tribunal de Circuito de Apelaciones al determinar que todos los querellados contestaron la querella, a pesar de que del propio expediente surge que un querellado nunca contestó la querella.

Considerado el recurso de apelación presentado el 30 de mayo de 1996 como uno de <u>certiorari</u> por ser el apropiado, concedimos a los recurridos un término para que expresaran las razones por las cuales no debíamos revocar la sentencia del Tribunal de Circuito. Con el beneficio de su comparecencia, resolvemos sin ulteriores procedimientos.

II. <u>SIGNIFICADO DEL TERMINO "DISTRITO JUDICIAL" BAJO LA LEY NUM. 2</u>

En el primer señalamiento, el obrero peticionario sostiene que el Tribunal de Circuito interpretó incorrectamente el significado del término "distrito judicial" y por consiguiente, erró al resolver que en este caso aplicaba el término de quince (15) días para contestar la querella instada al amparo de la Ley Núm. 2, supra. Le asiste la razón.

Iniciamos nuestro análisis utilizando como punto de partida la Sec. 3 de la Ley Núm. 2, supra, que dispone, en lo aquí pertinente, lo siguiente:

> El secretario del tribunal notificará a la parte querellada con copia de la querella, apercibiéndole que deberá radicar su contestación por escrito, con constancia de haber servido copia de la misma al abogado de la parte querellante o a ésta si hubiere comparecido por derecho propio, <u>dentro de diez (10) días después de</u>

> la notificación, si ésta se hiciere en el distrito judicial en que se promueve la acción, y dentro de quince (15) días en los demás casos, y apercibiéndole, además, que si así no lo hiciere, se dictará sentencia en su contra, concediendo el remedio solicitado, sin más citarle ni oírle. Solamente a moción de la parte querellada, la cual deberá notificarse al abogado de la parte querellante o a ésta si compareciere por derecho propio, en que se expongan bajo juramento los motivos que para ello tuviere la parte querellada, podrá el juez, si de la faz de la moción encontrara causa justificada, prorrogar el término para contestar. En ningún otro caso tendrá jurisdicción el tribunal para conceder esa prórroga. (Enfasis suplido.)

La sección citada claramente establece que el término de quince (15) días para contestar la querella sólo aplica a casos en los cuales la notificación de la misma se diligencia en un distrito judicial distinto al que se promueve la acción.

En su dictamen el Tribunal de Circuito concluyó que, "[era] plausible entender que para los efectos de la Ley Núm. 2, supra, el término distrito signifi[caba] municipio." Por lo tanto, resolvió que en vista de que la acción fue presentada en el municipio de Arecibo y que su notificación se diligenció en los municipios de Hatillo y Camuy, el plazo que tenían los recurridos para contestar era el de quince (15) días por haberse hecho la notificación en un municipio distinto de aquél en el que se promovió la acción. Los recurridos utilizan este mismo razonamiento para apoyar su posición.

En términos generales, "distrito judicial" se puede definir como el territorio sobre el cual tiene competencia un tribunal en particular. Este término también ha sido definido como "[o]ne of the circuits or precincts into which a state is commonly divided for judicial purposes; a court of general original jurisdiction being usually provided in each of such districts, and the boundaries of the district marking the territorial limits of its authority; or the district may include two or more counties, having separate and independent county courts, but in that case they are presided over by

the same judge."[7] (Énfasis suplido.)  Black's Law Dictionary 761 (5<sup>ta</sup> ed. 1979).  Por su parte el término "municipio" se define como "una demarcación geográfica con todos sus barrios, que tiene nombre particular y está regida por un gobierno local compuesto por un Poder Legislativo y un Poder Ejecutivo." Art. 1003(u) de la Ley de Municipios Autónomos, según enmendada, Ley Núm. 81 de 30 de agosto de 1991; 21 L.P.R.A. sec. 4001(u).  También ha sido definido como "[p]ueblo con sus respectivos barrios que forman un distrito político.  Se rige por las leyes del gobierno central y además por las ordenanzas aprobadas por su asamblea municipal y su alcalde."  Rivera García, Dicc. de términos jurídicos, 176, 1976.

Ciertamente, el término "distrito judicial" se refiere exclusivamente a la demarcación de un área geográfica sobre la cual la sala particular del Tribunal de Primera Instancia tiene competencia para resolver la controversia ante su consideración.  Mientras que "municipio" es un conjunto de habitantes de una delimitación territorial específica que forma parte de un distrito político que, además de ser gobernado por las leyes del gobierno central, se rige por las ordenanzas que a su vez promulga en su territorio.  Es claro que dentro de estas definiciones, "municipio" no es igual a "distrito judicial".

De otra parte, la Ley Núm. 2 de 17 de octubre de 1961, supra, tiene su génesis en la Ley Núm. 10 de 14 de noviembre de 1917.  En lo que respecta a nuestra discusión sobre **"distrito judicial"**, la Ley Núm. 10, supra, disponía en su Sec. 1 que cuando un trabajador agrícola reclamara de su patrono cualquier suma por concepto de salarios, debía comparecer ante el Juez Municipal del **Distrito Judicial Municipal** donde estuviera ubicada la finca en que se realizó el trabajo.  En dicho distrito judicial debía formular una querella, en la cual se expresaran

---

[7] En un sistema judicial unificado de jurisdicción general como el nuestro, todos los tribunales de instancia tienen la misma jurisdicción, es decir, la misma autoridad y poder.  Es la competencia lo que varía entre ellos.

bajo juramento los hechos que motivaban su reclamación. Se disponía, además, que si la finca estaba radicada en territorio correspondiente a dos o más **distritos judiciales municipales**, podría presentarse la querella en cualquiera de las Cortes en cuyo territorio radicare alguna porción de la finca. Posteriormente, se aprobó la Ley Núm. 17 de 11 de abril de 1945.[8] En virtud de dicha ley se enmendó, entre otras, la Sec. 1 de la Ley Núm. 10, supra, para disponer que cualquier reclamación de un obrero contra su patrono podía dilucidarse **"ante la corte municipal del distrito judicial en que se realizó el trabajo o en que resida el obrero o empleado en la fecha de la reclamación ..."**. La ley introdujo el término "distrito judicial" y utilizó dicho término para referirse a la delimitación del área geográfica que comprendía alguna sala de la entonces Corte Municipal.

La Ley Núm. 10, supra, fue enmendada nuevamente por la Ley Núm. 182 de 12 de mayo de 1948. Esta ley ratificó la utilización del término "distrito judicial" e hizo claro en su texto que dicho término se refería a aquel lugar donde se promovía la acción. (Enfasis nuestro.) Específicamente se refirió al territorio sobre el cual un tribunal tiene competencia para dilucidar algún asunto en particular.[9]

El 15 de mayo de 1950 se aprobó la Ley Orgánica de la Judicatura de Puerto Rico. De acuerdo a esta ley, el término "distrito judicial" se utilizó para delimitar el área geográfica sobre la cual las salas

---

[8]Anterior a la Ley Núm. 17, supra, se aprobó la Ley Núm. 13 de 20 de abril de 1932 enmendando las Secs. 2 y 10. Sin embargo, para propósitos de nuestra discusión, tales enmiendas no son pertinentes al asunto que nos ocupa.

[9] En su Sec. 2 dispuso, en lo pertinente, lo siguiente:

El Juez dictará una orden para que se notifique a la parte querellada con copia de la querella, apercibiéndole que deberá radicar su contestación por escrito, con constancia de haber servido copia de la misma al abogaado [sic] de la parte querellante o a ésta si hubiera comparecido por derecho propio, dentro de diez (10) días después de la notificación, si ésta se hiciere en el **distrito judicial** en que se promueve la acción, y dentro de quince (15) días en los demás casos. (Enfasis nuestro.)

del entonces Tribunal de Distrito tenían competencia para resolver una controversia. En cuanto a la organización del Tribunal, específicamente dispuso en su Art. 24 lo siguiente:

> El Tribunal de Distrito de Puerto Rico constará de las Secciones de San Juan, Bayamón, Arecibo, Aguadilla, Mayagüez, Ponce, Guayama, Humacao y Caguas y cada una de dichas Secciones comprenderá los pueblos que actualmente forman los distritos judiciales de San Juan, Bayamón, Arecibo, Aguadilla, Mayagüez, Ponce, Guayama, Humacao y Caguas respectivamente.

La Ley de la Judicatura de 1950 fue enmendada por la Ley de la Núm. 11 de 24 de julio de 1952. En virtud de tal ley, las Salas del Tribunal de Distrito se convirtieron en las Salas del Tribunal Superior. Las Cortes Municipales se convirtieron a su vez en Salas del Tribunal de Distrito. No obstante, dejó inalterada la fraseología en cuanto al significado y utilización del término "distrito judicial". Véase, Art. III de la Ley Núm. 11 de 24 de julio de 1952, supra.[10]

En el 1961, la actual Ley Núm. 2, supra, dispuso que el querellado debía contestar la querella en el plazo de diez (10) días si ésta se notifica dentro del distrito judicial en el que se promueve la acción. Ahora bien, cuando la querella se notifica en un distrito judicial distinto a aquél que fue presentada, el querellado tiene un plazo de quince (15) días para contestar la misma.

A la luz del análisis hecho en torno a las leyes que precedieron a la Ley Núm. 2 de 17 de octubre de 1961, supra, y de las leyes de la judicatura, podemos colegir inequívocamente que al hablar de "distrito judicial", se hace referencia exclusivamente a las demarcaciones territoriales correspondientes al tribunal de instancia que tiene competencia para entender en el asunto.

---

[10] Como sabemos, después de la Ley de la Judicatura de 1952 la Legislatura reestructuró el sistema judicial, aprobando las siguientes leyes: la Ley Núm. 11 de 2 de junio de 1993; el Plan de Reorganización Núm. 1 de la Rama Judicial de 28 de julio de 1994, conocido como la Ley de la Judicatura de Puerto Rico de 1994 y la Ley de la Judicatura de Puerto Rico de 1994, según enmendada por la Ley Núm. 248 de 25 de diciembre de 1995.

Erró el Tribunal de Circuito de Apelaciones al interpretar, que para los efectos de la Ley Núm. 2, supra, los conceptos "distrito judicial" y "municipio" son equivalentes.

Actualmente, en nuestro ordenamiento jurídico, la delimitación geográfica de los distritos judiciales está contemplada por el Art. 5.005 del Plan de Reorganización Núm. 1 de la Rama Judicial, de 28 de julio de 1994, según enmendado, conocido como la Ley de la Judicatura de Puerto Rico de 1994, 4 L.P.R.A. sec. 22q (Supl. 1997). En dicho artículo se establece el área territorial que comprenden los distritos o regiones judiciales. Los mismos están compuestos de una Sala Superior del Tribunal de Primera Instancia que incluye varios municipios. Dicho artículo dispone, en lo que aquí respecta, que:

> El Tribunal de Primera Instancia tendrá sedes y salas y celebrará sesiones en San Juan, Bayamón, Arecibo, Aguadilla, Mayagüez, Ponce, Guayama, Humacao, Caguas, Aibonito, Utuado, Carolina y Fajardo. Además, tendrá salas y celebrará sesiones en aquellas sedes del Tribunal de Primera Instancia creadas por virtud del proceso de conversión de sedes del Tribunal de Distrito[11] en sedes del Tribunal de Primera Instancia de conformidad a lo dispuesto en las secs. 23i a 23k de este título. De conformidad a la necesidad judicial determinada por el Juez Presidente del Tribunal Supremo, a tenor con lo dispuesto en la Constitución del Estado Libre Asociado de Puerto Rico, podrá celebrar sesiones en todos los municipios que hasta la vigencia de esta Ley estaban incluidos en las anteriores regiones judiciales de igual nombre.
>
> Las regiones judiciales que comprenden las salas del Tribunal de Primera Instancia son las siguientes:[12]
>
> (a) San Juan – Incluye el municipio de San Juan.
>
> (b) Bayamón – Incluye los municipios de Cataño, Corozal, Dorado, Guaynabo, Naranjito, Toa Alta, Toa Baja, Vega Alta y Vega Baja.

---

[11] Según establece el Art. 9.001 de la Ley de la Judicatura de Puerto Rico de 1994, supra, 4 L.P.R.A. sec. 23c, las Secciones conocidas como Tribunal Superior y Tribunal Municipal fueron consolidadas y se incluyeron dentro de lo que ahora se conoce como Tribunal de Primera Instancia. Dicho artículo también dispone que el Tribunal de Distrito quedará abolido en un término de ocho (8) años a partir de la vigencia de esta ley. Dentro de este plazo permanecerá como una subsección del Tribunal de Primera Instancia.

[12] Cabe señalar que conforme a las definiciones que hemos establecido, "distrito judicial" sí equivale a "región judicial".

(c) Arecibo - Incluye los municipios de Barceloneta, Camuy, Ciales, Hatillo, Manatí, Morovis, Quebradillas y Florida.

....

Según las normas procesales actuales, la competencia de la distintas salas y subsecciones del Tribunal de Primera Instancia se determina utilizando criterios de cuantía, territorio y materia. La Sala Superior tiene competencia para entender en todo asunto, civil o criminal, que sea de la jurisdicción del Tribunal de Primera Instancia. De otra parte, la Subsección de Distrito conocerá concurrentemente con la Sala Superior, entre otras cosas "[d]e todo asunto civil en que la cuantía en controversia, [...] no exceda de cincuenta mil (50,000) dólares, sin incluir intereses costas y honorarios de abogado." Art. 9.103(a) de la Ley de la Judicatura de Puerto Rico de 1994, supra, 4 L.P.R.A. sec. 23k(a)(1). La determinación sobre a cuál de las distintas salas o subsecciones le corresponde resolver un caso en particular dependerá, además de en la cuantía, en la demarcación territorial a la cual las normas procesales hayan asignado dicho caso.

De los documentos que obran en autos se desprende que la reclamación del obrero peticionario excede de los cincuenta mil dólares ($50,000), que la causa de acción surgió en el municipio de Camuy, sitio donde ubica la Vaquería Espinosa y que los recurridos fueron notificados de la querella en los municipios de Camuy y Hatillo, que corresponden a la Sala Superior del Tribunal de Primera Instancia, región de Arecibo. A tenor con los Arts. 5.005 y 9.103(a) de la Ley de la Judicatura de Puerto Rico de 1994, supra, y la Regla 3 de Procedimiento Civil, 32 L.P.R.A. Ap. III (Supl. 1997), la competencia sobre este asunto le corresponde a la Sala Superior de Arecibo. Los municipios de Hatillo y Camuy a su vez pertenecen al distrito o región judicial de la competencia de la Sala Superior de Arecibo del Tribunal de Primera Instancia, lugar donde se presentó la acción que hoy nos

ocupa. Así pues, no existe duda que la querella presentada fue notificada en el distrito judicial donde se promueve la acción y que tenía que ser contestada dentro del término de los diez (10) días.[13] Por tanto, erró el Tribunal de Circuito al dejar sin efecto la anotación de rebeldía contra los recurridos.

III. CONSIDERACION DE ERRORES POR UN TRIBUNAL APELATIVO

En el segundo señalamiento, el obrero peticionario aduce que incidió el Tribunal de Circuito al considerar los méritos de la sentencia emitida por el Tribunal de Primera Instancia, a pesar de que la orden para mostrar causa exigía únicamente que se expusieran razones por las cuales no debía dejarse sin efecto la anotación de rebeldía y si a tenor con las Reglas 45.2 y 67 de Procedimiento Civil, 32 L.P.R.A. Ap. III, se podía dictar una sentencia en rebeldía distinta a la súplica de la demanda o en exceso de la suma reclamada. El error señalado no fue cometido.

En aras de impartir justicia un tribunal apelativo tiene la facultad inherente para considerar y resolver errores patentes que surjan de un recurso aun cuando los mismos no hayan sido levantados por las partes. López v. I.T.T. Intermedia, P.C. de 4 de abril de 1997, 142 D.P.R. _____(1997), 97 JTS 42, pág. 839; Ríos Quiñones v. Adm. Servs. Agrícolas, Op. de 20 de mayo de 1996, 140 D.P.R.____ (1996), 96 JTS 71, pág. 1133; Rodríguez Cruz v. Padilla, 125 D.P.R. 486, 511-12 (1990); Ab Intestato Marini Pabón, 107 D.P.R. 433, 439 (1978); Santiago Cruz v. Hernández Andino, 91 D.P.R. 709, 711 (1965); Piovanetti v. Vivaldi, 80 D.P.R. 108, 121 (1957). Por lo tanto, el Tribunal de

---

[13] Nos preocupa la frecuencia con la que a este Tribunal llegan controversias que se circunscriben al incumplimiento con los plazos que establece la Ley Núm. 2, supra, para contestar la querella. Esto, en gran medida, denota una falta de diligencia por parte de los abogados que suscriben tales contestaciones, y perjudica a las partes que representan.

Circuito sí podía corregir errores patentes manifiestos en el recurso, aun cuando los mismos no hubiesen sido traídos a su consideración.

Sin embargo, como expresáramos en la nota al calce número 6, si el Tribunal de Circuito resolvió que no procedía la anotación de rebeldía, y que, por lo tanto, el caso debía ser devuelto al foro de instancia para que los recurridos contestaran la querella, no podía entonces pasar juicio sobre el cómputo de la reclamación por horas extras.

No obstante lo anterior, evaluaremos si dicho tribunal actúo correctamente al modificar la cuantía otorgada en tal reclamación.[14]

IV. COMPUTO DE LA COMPENSACION POR HORAS EXTRAS TRABAJADAS BAJO LA LEY NUM. 379

En la querella el obrero peticionario alegó lo siguiente: (i) que trabajó como ordeñador en la Vaquería Espinosa desde febrero de 1989 hasta el 15 de octubre de 1994 y que entre sus tareas se encontraba la de suministrar medicamentos al ganado;[15] (ii) que durante ese tiempo trabajó un horario de nueve (9) horas diarias, que se desglosaba en turnos de seis (6:00) a diez (10:00) de la mañana, y de cinco (5:00) de la tarde a diez (10:00) de la noche, ambos turnos los trabajaba dentro del período de veinticuatro (24) horas y (iii) que devengaba un sueldo de cinco dólares ($5) por hora. Conforme a estos hechos que surgen de las alegaciones de la querella, el foro de instancia, sin el beneficio de la celebración de una vista en rebeldía, resolvió que el obrero peticionario había trabajado: "un horario [...] de nueve (9) horas diarias (de las cuales

_____

[14] Por la conclusión a la que llegamos, no es necesario discutir si se equivocó el foro de instancia al dictar sentencia por una cuantía mayor a la solicitada. Regla 43.6 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

[15] El peticionario no especificó el día exacto en que comenzó a trabajar en la vaquería.

una [1] era extra por exceder las ocho [8] horas diarias [de la jornada legal]) y cuatro (4) horas diarias, que [también] resultaban extras porque el trabajo realizado entre las seis [6:00] y las diez [10:00] de la mañana no le permitía el descanso de [dieciséis] 16 horas entre jornada de trabajo." Dicho foro concluyó, que el obrero peticionario trabajó cinco (5) horas extras por día, que equivalían a veinticinco (25) horas semanales, que por doscientos noventa y cuatro punto cuatro (294.4) semanas alcanzaban un total de siete mil trescientos sesenta (7,360) horas extras. Así pues, por concepto de horas extras concedió al obrero peticionario setenta y tres mil trescientos sesenta dólares ($73,360),[16] más una suma igual por concepto de penalidad, para un total de ciento cuarenta y seis mil setecientos veinte dólares ($146,720).

Con esa misma prueba, el Tribunal de Circuito determinó que el obrero peticionario sólo había trabajado una (1) hora extra por día dentro de cinco (5) períodos de veinticuatro (24) horas semanales por doscientas noventa y cuatro punto cuatro (294.4) semanas (febrero de 1989 a octubre de 1994) para un total de mil cuatrocientas setenta y dos (1,472) horas extras, que a razón de cinco dólares ($5) totalizaban siete mil trescientos sesenta dólares ($7,360) o la suma de catorce mil setecientos veinte dólares ($14,720) en caso de que la novena hora no se le hubiese pagado a tiempo doble. Resolvió, además, que a tenor con los Arts. 4 y 5 de la Ley Núm. 379, supra, 29 L.P.R.A. secs. 273 y 274, así como el Art. III del Decreto Mandatorio Núm. 27, Cuarta Revisión de 31 de agosto de 1968, aplicable a la Industria de la Leche y de la Ganadería "[n]o se justifica[ba] en derecho asignarle cuatro (4) horas extras adicionales diarias por el hecho del horario fraccionado cuatro (4) y cinco (5) horas que patrono y empleado acordaron...".

Debemos analizar lo anterior a la luz de las disposiciones legales vigentes entonces y aplicables al caso que nos ocupa.

---

[16] Este cómputo lo hizo el foro de instancia a tiempo doble, o sea, a razón de diez dólares ($10) por hora extra trabajada.

El Art. 3 de la Ley Núm. 379, supra, 29 L.P.R.A. sec. 272,[17] entonces vigente, dispone que la jornada legal de trabajo en Puerto Rico equivale a ocho (8) horas de labor y que cuarenta (40) horas de labor constituyen una semana de trabajo. Por lo tanto, son horas regulares de trabajo ocho (8) horas <u>durante cualquier período de veinticuatro (24) horas consecutivas</u> y cuarenta (40) horas durante cualquier semana.

Por su parte, el Art. 4 de dicha ley, 29 L.P.R.A. sec. 273, en lo aquí pertinente, define horas extras como:

> (a) Las horas que un empleado trabaja para su patrono en exceso de ocho horas durante cualquier período de veinticuatro horas consecutivas;
> (b) Las horas que un empleado trabaja para su patrono en exceso de cuarenta durante cualquier semana, a menos que las horas trabajadas diariamente en exceso de ocho sean pagadas a tipo doble;
> (e) Las horas que el empleado trabaja para su patrono en exceso del máximo de horas de labor al día que la Junta de Salario Mínimo haya fijado o fijare para la ocupación, negocio o industria en cuestión....[18]

---

[17] Esta sección fue enmendada mediante la Ley Núm. 83 de 20 de julio de 1995.

[18] Respecto a las disposiciones legales citadas, el licenciado Acevedo Colom, en su obra titulada <u>Legislación Protectora del Trabajo Comentada</u>, 1ra rev., San Juan, 1991, pág. 72, expresa que para determinar si una hora trabajada es regular o extra, se debe evaluar si en el período de veinticuatro (24) horas inmediatamente anterior al momento en que termina la hora de trabajo en controversia se había trabajado ocho (8) horas regulares. Señala que si esto ocurre, la hora en controversia debe ser considerada como una extra. Además, como hecho relevante, Acevedo Colom indica que la semana de trabajo comienza siempre el mismo día y a la misma hora, mientras que la jornada legal de veinticuatro (24) horas consecutivas se computan de forma rotativa, o sea, que con cada hora y cada minuto que pasa tenemos un nuevo período de veinticuatro (24) horas. Acevedo Colom, ob. cit., pág. 73.

Para ilustrarnos sobre la forma de computar el pago de horas extras, el licenciado Acevedo Colom expone los siguientes ejemplos:

Un empleado trabaja ocho (8) horas regulares de lunes a viernes tiene un total de cuarenta (40) horas regulares. Ahora bien, si este empleado trabaja ocho (8) horas el sábado o en la alternativa el domingo entonces estas ocho horas (8) son extras por exceder de cuarenta (40) horas regulares en el transcurso de la semana.

Un empleado trabaja diez (10) horas diarias de lunes a jueves. En cada día se trabajaron ocho (8) horas regulares y dos (2) que resultan extras en virtud de la jornada diaria de trabajo. Concluida la jornada de trabajo del jueves vemos que el empleado ha acumulado en esa semana cuarenta (40) horas de labor. Del total de horas trabajadas en la

En cuanto al pago de las horas extras, el Art. 5 de la Ley Núm. 379, supra, 29 L.P.R.A. sec. 274, dispone, en lo aquí pertinente, que todas las horas trabajadas en exceso de ocho (8) horas diarias serán compensadas "al doble del tipo convenido para las horas regulares".

Finalmente, la Sec. 30 de la Ley Núm. 96, supra, 29 L.P.R.A. sec. 246b, dispone con relación a las reclamaciones por concepto de salarios (horas extras), vacaciones, licencias por enfermedad o cualquier otro beneficio, el pago de una penalidad equivalente al doble de lo adeudado.

En atención a los principios esbozados y conforme a las alegaciones de la querella, única prueba que tuvo ante sí el tribunal, es forzoso concluir que el obrero peticionario solamente trabajó una (1) hora extra por día dentro de cinco (5) períodos de veinticuatro (24) horas semanales por doscientas noventa y cuatro punto cuatro (294.4) semanas (febrero de 1989 a octubre de 1994). Esta hora extra nunca fue compensada de manera doble. Sin embargo, siendo dicha hora parte de la jornada regular del obrero peticionario, podemos inferir razonablemente que la misma fue pagada de forma sencilla como hora regular. Por lo tanto, el cómputo suma a mil cuatrocientos setenta y dos (1,472) horas extras, que a cinco dólares ($5) equivale a siete mil trescientos sesenta dólares ($7,360). Por estas horas extras se le pagó siete mil trescientos sesenta dólares ($7,360). Se quedó a deber una cantidad igual ya que el pago de estas horas extras era a tiempo doble. A esta cantidad hay que añadirle una suma igual por concepto de penalidad

---

semana treinta y dos (32) son regulares y ocho (8) son extras. El viernes el empleado trabaja ocho (8) horas que no resultan extras en virtud de la jornada diaria de trabajo. Entonces debemos preguntarnos, son regulares o extras las ocho (8) horas trabajadas el viernes. La respuesta a la interrogante anterior es que las ocho (8) horas trabajadas el viernes son regulares. Aquí tenemos que aplicar la regla antes esbozada en el sentido de que el tiempo extra trabajado durante la semana en virtud de la jornada diaria de trabajo no se toma en consideración para el cómputo de las cuarenta horas regulares que constituyen la semana de trabajo. Por lo tanto, no es hasta que tenemos el total de cuarenta horas regulares trabajadas en una semana que en virtud de la disposición relativa a la semana de trabajo comienza a considerarse tiempo extra todo el que se trabaje en exceso de dicho total. Acevedo Colom, ob. cit., pág. 72.

conforme dispone la Sec. 30 de la Ley Núm. 96, supra, para un total de catorce mil setecientos veinte dólares ($14,720).

Cabe señalar que bajo ninguna de las disposiciones legales citadas y aplicables al caso que nos ocupa, se justifica asignarle al obrero peticionario cuatro (4) horas extras adicionales diarias por el hecho de que el horario de trabajo fuera uno fraccionado de cuatro (4) y cinco (5) horas. Como bien expresó el Tribunal de Circuito en su sentencia, la Ley disponía que sólo serían horas extras, pagadas a tiempo doble, las trabajadas en exceso de ocho (8) horas <u>en cualquier periodo de veinticuatro (24) horas</u>. Véase, los Arts. 3 y 4 de la Ley Núm. 379 antes citada. Véase, además: el Art. III del Decreto Mandatorio Núm. 27, supra, también aplicable a los hechos que hoy nos ocupan.

Tomando en consideración todo lo antes expuesto, resolvemos que de los hechos bien alegados en la querella, surge que el obrero peticionario tiene derecho a la suma de siete mil trescientos sesenta dólares ($7,360) más una cantidad igual por concepto de penalidad según establece la Sec. 30 de la Ley Núm. 96, supra, para un total de catorce mil setecientos veinte dólares ($14,720) por concepto de horas extras. No se equivocó el Tribunal de Circuito al determinar la cuantía por concepto de horas extras adeudadas al obrero peticionario. Esto, sin embargo, no pone fin al asunto que nos ocupa. Procede que evaluemos las demás alegaciones de la querella.

V.   <u>SUFICIENCIA DE LAS ALEGACIONES Y LA SENTENCIA EN REBELDIA BAJO LA LEY NUM. 2</u>

El tribunal de instancia resolvió que por un período de treinta y seis (36) días consecutivos, desde el 15 de septiembre de 1993 al 21 de octubre de 1993, al obrero peticionario no se le permitió disfrutar de las dos (2) horas para ingerir alimentos que le correspondían debido a su horario de trabajo. Determinó, además, que durante ese período

acumuló horas extras porque tampoco se le permitió el período de descanso entre jornada de trabajo. En vista de ello le adjudicó la cantidad de dos mil quinientos veinte dólares ($2,520) incluyendo penalidad, por concepto de horas para tomar alimentos. También le concedió, por concepto de horas extras, cinco mil setecientos sesenta dólares ($5,760), más una suma igual por concepto de penalidad para un total de once mil quinientos veinte dólares ($11,520). Erró el foro de instancia al conceder tales cuantías.[19]

En _Rivera_ v. _Insular Wire Products_, Op. de 24 de mayo de 1996, 140 D.P.R.\_\_\_(1996), 96 JTS pág. 1172, expresamos que "el procedimiento judicial sumario establecido por la Ley Núm. 2, [supra], tiene como fin primordial el proveerle al obrero un mecanismo procesal acortado que facilite y aligere el trámite de sus reclamaciones laborales." Reiteramos, "que era esencial brindarle al patrono las oportunidades básicas del debido proceso de ley para defender sus derechos, y luego de analizar el procedimiento establecido en la Ley Núm. 2, [supra], concluimos que éste cumplía con los elementos básicos del debido proceso de ley." Así pues, ratificamos la constitucionalidad de dicho procedimiento sumario.[20] Id. a la pág. 1170. Además, señalamos que "[a]unque este procedimiento limita el uso de las reglas procesales y sitúa al patrono en una posición procesalmente un poco más onerosa que la del obrero, el procedimiento sumario, no es, ni puede ser, una carta en blanco para la concesión de remedios a obreros que no han

---

[19] En cuanto a la determinación del foro de instancia sobre este aspecto, el Tribunal de Circuito se limitó a decir que ninguna de las partidas se justificaba ya que las mismas no tenían razón de ser y carecían de fundamentos.

[20] En _Landrum Mills Corp._ v. _Tribunal Superior_, 92 D.P.R. 689, 691 (1965), expresamos que "[e]l procedimiento para la reclamación de salarios del 1961 es un procedimiento especial, de naturaleza sumaria, y por considerar el Estado, que cualquier cuestión relacionada con el contrato de trabajo, por su posible efecto sobre la economía de nuestro pueblo, está revestida de interés público, tiene ciertas disposiciones que son más favorables al obrero que al patrono, por haber sido la conclusión del estudio legislativo que no existe igualdad de medios económicos entre las partes para una adecuada defensa de sus respectivos derechos, al originarse la reclamación judicial."

justificado adecuadamente, mediante alegaciones o prueba, hechos que avalen, su derecho a lo reclamado." (Enfasis suplido.) Id. a la pág. 1172. Véase, además: Díaz v. Hotel Miramar Corp., 103 D.P.R. 314, 324 (1975).

Respecto a las sentencias dictadas en rebeldía bajo el procedimiento sumario de la Ley Núm. 2, supra, y conforme a la norma establecida en Continental Ins. Co. v. Isleta Marina, 106 D.P.R. 809, 815 (1978),[21] resolvimos que alegaciones concluyentes y determinaciones de derecho, al igual que hechos alegados incorrectamente, no son suficientes para sostener una determinación de responsabilidad del patrono. Los daños generales reclamados, al no constituir una suma líquida, tienen que probarse; no es suficiente con simplemente alegar que los daños montan o suman a la cantidad reclamada. Bajo cualesquiera circunstancias, la cuantía de los daños debe ser objeto de prueba. Véase, además: Rivera v. Insular Wire, a la pág. 1174 y Rivera v. Goytía, 70 D.P.R. 30, 33 (1949).

En cuanto a la adjudicación de un pleito en rebeldía hemos reiterado que:

> ...los tribunales no son meros autómatas obligados a conceder indemnizaciones por estar dilucidándose un caso en rebeldía. Para el descargo de tan delicado ministerio, la ley reconoce que el proceso de formar consciencia judicial exige la comprobación 'de cualquier aseveración' mediante prueba. A tal efecto, el tribunal 'deberá celebrar las vistas que crea necesarias y adecuadas.' Y con referencia a una parte demandada en rebeldía--- que ha comparecido previamente --- le cobija el derecho a conocer del señalamiento, asistir a la vista, contrainterrogar los testigos de la parte demandante, impugnar la cuantía y apelar la sentencia. No renuncia a las defensas de falta de jurisdicción ni de que la demanda no aduce hechos constitutivos de una causa de acción a favor del reclamante. En otras palabras, un trámite en rebeldía no garantiza per se, una sentencia favorable al demandante; el demandado no admite hechos incorrectamente alegados como tampoco conclusiones de derecho. (Citas omitidas.) Continental Ins. Co. v. Isleta Marina, supra, pág. 817.

---

[21] En Continental Ins. Co. v. Isleta Marina, 106 D.P.R. 809, 815 (1978) resolvimos que "el trámite de un caso en rebeldía tiene como consecuencia jurídica que se estimen aceptadas todas y cada una de las materias bien alegadas en la demanda." Además, definimos la frase "materias bien alegadas" como "los hechos correctamente alegados." Véase, 10 Wright & Miller, Federal Practice & Procedure, pág. 282.

A tenor con los principios esbozados evaluamos si procedía la determinación que hiciera el foro de instancia en cuanto a la concesión de horas extras y horas para tomar alimentos durante el período del 15 de septiembre al 21 de octubre de 1993.

La alegación que dio base a la determinación del foro de instancia fue la siguiente:

> Como resultado de la enfermedad en el ganado, el querellante fue forzado a trabajar [treinta y seis] 36 días corridos, desde el 15 de septiembre al 21 de octubre de 1993, lo que conllevó un horario de [dieciséis] 16 horas diarias durante las cuales no tomó las dos (2) horas para ingerir alimentos; como tampoco pudo descansar el término de 16 horas que la ley dispone entre jornada de trabajo. Ello conllevó la acumulación de horas extras, así como las horas de tomar alimentos las cuales, no le fueron compensadas.

De una lectura desapasionada resulta ineludible la conclusión de que la alegación del peticionario no consigna hechos suficientes que razonablemente permitan resolver como lo hizo el foro de instancia. Esta ni siquiera incluye un desglose del horario trabajado cada día que nos permita responsablemente determinar, mediante un cómputo matemático, el remedio que solicita. Para resolver esta reclamación resulta necesario la celebración de una vista en rebeldía. No procede la concesión de esta reclamación en esta etapa de los procedimientos.

El tribunal de instancia también determinó que conforme a la Ley Núm. 115, supra, el obrero peticionario tenía derecho al remedio especial que ésta ofrece. A base de las alegaciones en la querella resolvió que éste fue despedido por haber brindado información sobre su patrono a un foro administrativo, la Oficina del Administrador de Reglamentación de la Industria Lechera. Por ende le concedió: (i) la cantidad de veinte mil dólares ($20,000) por concepto de salarios dejados de percibir, computados a razón de cinco dólares ($5) la hora a partir de la fecha de su despido hasta la presentación de la querella;

(ii) la suma de cinco mil dólares ($5,000) por concepto de honorarios de abogado y (iii) "orden[ó] la reposición [del obrero peticionario en] su empleo y el pago de salarios a razón de cuarenta dólares ($40) por cada día transcurrido[22] desde la fecha de la radicación de la querella, cuyo pago continuará por cada día que transcurra hasta que el [obrero peticionario] sea repuesto en su empleo, más una suma igual por concepto de penalidad."

El inciso c del Art. 2 de la Ley Núm. 115, supra, dispone lo siguiente:

> El empleado deberá probar la violación mediante evidencia directa o circunstancial. El empleado podrá, además, establecer un caso prima facie de violación a la ley probando que participó en una actividad protegida por las secs. 194 et seq. de este título y que fue subsiguientemente despedido, amenazado o discriminado en su contra de su empleo. Una vez establecido lo anterior, el patrono deberá alegar y fundamentar una razón legítima y no discriminatoria para el despido. De alegar y fundamentar el patrono dicha razón, el empleado deberá demostrar que la razón alegada por el patrono era un mero pretexto para el despido.

En Marín v. Fastening Service System, Inc., Op. de 7 de febrero de 1997, 142 D.P.R.___(1997), 97 JTS 17, pág. 614, tuvimos la oportunidad de interpretar esta Ley. Allí expresamos que:

> ...para tener derecho al remedio que concede la Ley Núm. 115, supra, el obrero querellante tiene que probar la violación a las disposiciones de la Ley, mediante evidencia directa o circunstancial. Para facilitar el onus probandi que le impuso al obrero, dispuso que éste establecería un caso prima facie cuando presentase evidencia, directa o circunstancial, que probase: primero, que participó en una de las actividades protegidas por la Ley; y segundo, que subsiguientemente fue despedido o amenazado o sufrió discrimen en el empleo. La Ley crea un presunción juris tantum de violación a la misma a favor del querellante, al disponer que éste establece un caso prima facie una vez prueba que participó en una actividad protegida y que fue subsiguientemente despedido, amenazado o discriminado en su contra en el empleo. Una vez el querellante establece de forma prima facie su caso, el patrono deberá alegar y fundamentar que tuvo una razón legítima y no discriminatoria para el despido. Ante esto, el empleado, aún puede prevalecer si prueba que la razón alegada por

---

[22] A pesar de que el foro de instancia no lo cualificó, entendemos que la suma concedida en este renglón fue calculada a base del pago por días laborales, es decir, cinco (5) días a la semana.

el patrono es un simple pretexto para el despido discriminatorio.

En armonía con los principios antes esbozados examinamos la alegación sobre violación a la Ley Núm. 115, supra. Esta lee así:

Como resultado de investigaciones sanitarias realizadas por la industria lechera en la vaquería de los querellados, el querellante fue entrevistado para determinar el proceso seguido en la misma en torno a la producción de la leche. Este suplió la información que le fue requerida y las pruebas arrojaron una concentración alta de bacterias que requerían la destrucción del producto. Se corroboró también que la parte querellada estaba transportando, de manera ilegal, leche desde la vaquería que dicha parte posee en San Sebastián a la vaquería localizada en Quebradillas. A raíz de esta situación, la parte querellada presionó, hostigó y finalmente despidió al querellante por haber provisto información relacionada a esta investigación. (Enfasis suplido.)

Como podemos observar, la anterior aseveración no especifica cuándo se llevó a cabo la investigación, ni cuáles fueron las actuaciones del patrono (recurridos) que constituyeron actos de hostigamiento y presión. El obrero peticionario simplemente se limitó a expresar que fue entrevistado en torno a una investigación que se llevó a cabo por la industria lechera y que suplió la información requerida. Luego indicó que las pruebas arrojaron una concentración alta de bacterias que requerían la destrucción del producto. A renglón seguido y sin relacionar los hechos con la información suplida por él, informó que "se corroboró" que el patrono transportaba leche de manera ilegal. Por último, de manera conclusoria y sin especificar, aun de forma general, los hechos en que se basa, concluyó que, como consecuencia de la información ofrecida, el patrono lo "presionó, hostigó y finalmente lo despidió." El obrero peticionario tampoco indicó cuál fue el lapso de tiempo que transcurrió entre la investigación y estos actos, de forma tal que se pudiera lógicamente inferir que uno fue la consecuencia lógica del otro, una represalia por parte del patrono. Es menester señalar que el lapso de tiempo resulta un dato importante que podría apoyar la conclusión de que el despido se

hizo como represalia por la información suplida con relación a la investigación.

Acorde con lo resuelto en Marín v. Fastening Service Systems, Inc., supra, las alegaciones en este caso tampoco contienen hechos suficientes para apoyar la concesión de una sentencia en rebeldía sin vista al amparo de la Ley Núm. 115, supra. Recordemos, que el procedimiento sumario establecido en la Ley Núm. 2, supra, **"no es, ni puede ser, una carta en blanco para la concesión de remedios a obreros que no han justificado adecuadamente, mediante alegaciones o prueba, hechos que avalen su derecho a lo reclamado."** Disponer lo contrario atentaría con los principios fundamentales de impartir justicia y constituiría un patente abuso del derecho. Así pues, a la luz de lo discutido, en este caso no procedía la concesión de los remedios de la Ley Núm. 115, supra, en esta etapa de los procedimientos. Sin embargo, de las alegaciones de la querella, interpretadas liberalmente a favor del obrero peticionario, se puede colegir que éste hizo una reclamación válida al amparo de la Ley Núm. 115, supra. Rivera v. Insular Wire Products Corp., supra, págs. 1172–1173. Le corresponde pues al foro de instancia determinar, de forma preliminar, si por la naturaleza de la reclamación, ésta debía tramitarse por la vía ordinaria o bajo el procedimiento sumario de la Ley Núm. 2, supra. Si concluye que procede el trámite sumario, debe proceder a celebrar vista en rebeldía ya que las alegaciones de la querella no son suficientes para conceder lo allí reclamado. Marín v. Fastening Service Systems, Inc., supra.

Por otra parte, podemos colegir que de las alegaciones antes mencionadas sí surgen hechos suficientes que válidamente se pueden enmarcar dentro de una reclamación por despido sin justa causa al amparo de la Ley Núm. 80, supra. Esto significa que en este caso, el tribunal de instancia sí podía dictar sentencia en rebeldía y conceder el remedio provisto por esta ley. Por lo tanto actuó correctamente al conceder la mesada.

Ahora bien, siendo el remedio que se concede al amparo de la Ley Núm. 80, supra, uno exclusivo, si el obrero demandante logra probar su reclamación bajo la Ley Núm. 115, supra, y la cantidad otorgada resulta ser mayor que la concedida bajo la Ley Núm. 80, supra, lo que procede es que se le rebaje a lo concedido bajo la Ley Núm. 115, supra, lo que previamente el obrero recibiera bajo la Ley Núm. 80, supra. De esta forma se logra armonizar el propósito de la Ley Núm. 80 de proveer al obrero un remedio económico rápido, que aunque limitado, lo ayuda en su transición entre un empleo y otro; sin que la necesidad lo fuerce a perder su derecho a reclamar y probar, que bajo otras leyes laborales tiene derecho a remedios más amplios y a compensaciones mayores.[23]

Pasemos ahora a examinar la corrección de la cuantía otorgada por concepto de despido injustificado bajo la Ley Núm.80.


VI. LA MESADA POR DESPIDO SIN JUSTA CAUSA BAJO LA LEY NUM. 80, SUPRA.

El Art. 1 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185a, entonces vigente y aplicable al caso de autos, en términos generales dispone que cualquier empleado de una industria, comercio o negocio o sitio de empleo, que fuere despedido de su cargo sin justa causa, tendrá derecho a recibir de su patrono además del sueldo devengado, el salario correspondiente a un mes por concepto de indemnización y una indemnización progresiva adicional equivalente a una semana por año de servicio.[24] Véase, Delgado Zayas

---

[23] Esta medida permite el que un tribunal, al confrontarse con una demanda en la que se han incluido varias reclamaciones al amparo de distintas leyes laborales, pueda separarlas, y resolver algunas por el procedimiento sumario de la Ley Núm. 2, supra, como por ejemplo, la reclamación bajo la Ley Núm. 80, supra, mientras continúa con las otras, que pueden ser más complicadas, por la vía ordinaria. Véase, Rivera v. Insular Wire Products, supra, pág. 1173. También evita el que los patronos, mediante el pago de la mesada por la Ley Núm. 80, supra, al momento del despido, desalienten o traten de impedir, el que un obrero reclame derechos más amplios al amparo de legislación laboral específica encaminada a evitar y erradicar prácticas que se consideran nocivas para el ambiente laboral. Debemos aclarar, sin embargo, que nada de lo antes expuesto permite el que un obrero pueda fraccionar su causa de acción por el hecho de que reclame bajo distintas leyes o teorías legales. Véase, Ramos González v. Félix Medina, 121 D.P.R. 312, 332 (1988).

v. Hosp. Int. Med. Avanzada, Op. de 5 de septiembre de 1994, 137 D.P.R.___(1994), 94 JTS 149, pág. 499.

A tenor con el texto del Art. 1, supra, la cantidad que corresponde al obrero peticionario por concepto de mesada equivale a la suma de mil ochocientos dólares ($1,800). Este cálculo lo hemos computado a razón de cuarenta (40) horas regulares semanales, a cinco dólares ($5) por hora, lo que equivale a la suma de doscientos dólares ($200) semanales. Esto multiplicado por cuatro (4) semanas, asciende a la totalidad de ochocientos dólares ($800) mensuales. El obrero peticionario trabajó cinco (5) años completos contados desde febrero de 1989 hasta octubre de 1994. Conforme dispone la ley aplicable, a éste le corresponde una indemnización equivalente al sueldo de una semana por año trabajado, que multiplicada por doscientos dólares ($200) asciende a la suma de mil dólares ($1,000); más el sueldo de un mes para un total de mil ochocientos dólares ($1,800) por concepto de mesada. Erró el foro de instancia al concederle al peticionario la cuantía de mil ochocientos sesenta dólares ($1,860) por concepto de mesada.

## VII.  PAGO DE BONO DE NAVIDAD Y DE VACACIONES

En lo que respecta a la reclamación por concepto de bono de navidad, el peticionario alegó que durante el tiempo que trabajó en la vaquería nunca se le pagó cantidad alguna por concepto de bono de navidad.  El foro de instancia determinó que por exclusión expresa del Art. 5 de la Ley Núm. 148, supra, 29 L.P.R.A. sec. 505, éste no tenía derecho a tal pago.

El Art. 5 de dicha ley establece que serán excluidas de las disposiciones referentes al pago de bono "las personas empleadas en actividades agrícolas, en el servicio doméstico o en residencia de familia, o en instituciones de fines caritativos y a los funcionarios y empleados del Estado Libre Asociado, sus corporaciones públicas y

---

[24] El inciso (a) de esta ley fue enmendado el 17 de septiembre de 1996. Ahora establece que si el despido ocurre dentro de los primeros cinco (5) años de servicio, el obrero tendrá derecho a una indemnización correspondiente al sueldo de un mes.  Tendrá derecho al sueldo de dos (2) meses, si el despido ocurre luego de los primeros cinco (5) años pero dentro de los quince (15) años de servicio.  Finalmente, el obrero tendrá derecho al sueldo correspondiente a tres (3) meses si el despido ocurre luego de los quince años de servicio.

municipalidades, que ocupen un cargo, puesto o empleo de carácter continuo o irregular." (Enfasis suplido.)

De la disposición citada no existe duda de que el obrero peticionario es uno de los empleados que están expresamente excluidos por la ley. Por consiguiente, no tiene derecho a la reclamación por concepto de bono de navidad. En vista de ello, no erró el tribunal de instancia en su determinación.

Finalmente, en cuanto a la reclamación por concepto del pago de vacaciones el peticionario hizo la siguiente alegación:

> [L]a parte querellada [recurridos] nunca le permitió al querellante [obrero peticionario] disfrutar de vacaciones regulares como estipula la ley, aunque se las pagó en forma sencilla a la vez que trabajaba.

Conforme a lo alegado y las disposiciones de ley aplicables, el foro de instancia determinó que por el obrero peticionario no haber disfrutado de sus vacaciones, los recurridos venían obligados a compensar las mismas de forma doble. Añadió que este derecho es irrenunciable y el pago de dinero a cambio de su disfrute es ilegal y nulo. Señaló, además, que el pago de dinero a cambio del disfrute de las vacaciones, por ser ilegal, no puede ser levantado como defensa por los recurridos. En apoyo de lo expresado citó la Sec. 18 de la Ley Núm. 96 de 26 de junio de 1956, según enmendada, 29 L.P.R.A. sec. 245 y la Opinión del Secretario del Trabajo Núm. 91-4 de 1ro. de noviembre de 1991. Concedió la suma total de seis mil dólares ($6,000), más una suma igual por concepto de penalidad para un total de doce mil dólares ($12,000).

El Art. V del Decreto Mandatorio Núm. 27, supra, aplicable a la Industria de la Leche dispone que:

> [t]odo empleado de la fase agrícola o de la fase industrial tendrá derecho a vacaciones con sueldo completo que se hará efectivo al empezar a disfrutarlas, a razón de un día y cuarto (1¼) por cada mes en que haya tenido por lo menos ciento veinte (120) horas de labor. Las vacaciones se concederán anualmente en forma que no interrumpan el normal funcionamiento del negocio, a cuyo fin el patrono establecerá los turnos correspondientes. Mediante acuerdo entre patrono y empleado podrá

acumularse durante más de un año, y en caso de que el empleado cese en su trabajo, el patrono le hará efectivo el total hasta entonces acumulado. Si la compensación no se ha estipulado por día o período mayor, la correspondiente a cada día de vacaciones se determinará multiplicando por ocho (8) el promedio del jornal por hora devengado por el empleado durante el año a que correspondan vacaciones.

Por su parte, la Opinión del Secretario del Trabajo Núm. 91-4 de 1 de noviembre de 1991, expresa, como norma general, que "los empleados tendrán derecho a vacaciones con sueldo completo que se hará efectivo al comenzar a disfrutarlas." Indica, además, que según la Sec. 18 de la Ley Núm. 96 de 26 de junio de 1956, 29 L.P.R.A. sec. 245, tal derecho es irrenunciable. Señala, que "[p]or excepción, los decretos mandatorios disponen usualmente que la renuncia al disfrute de hecho de las vacaciones a cambio de dinero será ilegal y nula." Añade que algunos decretos permiten lo anterior, siempre y cuando el obrero esté de acuerdo y el Departamento del Trabajo y Recursos Humanos conceda la autorización para ello. La reglamentación específica sobre esta materia dependerá de lo establecido en el decreto aplicable a cada situación. En algunos casos la violación a esa norma general hará que el pago sea ilegal y nulo, por lo que no podría ser levantado como defensa por el patrono. Finalmente, el Secretario del Trabajo expone que la mayor parte de los decretos permiten, por acuerdo escrito entre patrono y empleado, que las vacaciones se acumulen sin disfrutarlas durante más de un (1) año, pero nunca por más de dos (2) años. Aclara, sin embargo, que para desalentar el que un patrono no conceda las vacaciones a que tiene derecho cualquiera de sus empleados por más de esos dos (2) años, algunos decretos establecen que el patrono deberá concederle al empleado el total acumulado hasta entonces, pagándole dos (2) veces el sueldo correspondiente por la licencia acumulada en exceso de dichos dos (2) años.

Cabe señalar que hemos examinado detenidamente la Sec. 18 de la Ley Núm. 96, supra, y no hemos encontrado una expresión específica de que el derecho a vacaciones sea uno irrenunciable. Sin embargo, de una

lectura integral de la declaración de principios que contiene esta sección, se puede razonablemente deducir que la intención legislativa fue que este derecho adviniera en uno irrenunciable; salvo las modificaciones dispuestas en los distintos decretos mandatorios.

De todo lo anterior podemos colegir que el derecho a vacaciones consiste del disfrute y paga de las mismas; que salvo a lo dispuesto en los distintos decretos éste es un derecho irrenunciable; y que los días de licencia por vacaciones acumulados en exceso de dos (2) años deberán ser liquidados a razón del doble que corresponda. Expuestas las normas de derecho aplicables, procedemos a evaluar la corrección de las cuantías otorgadas por vacaciones.

A tenor con el decreto aplicable, Decreto Mandatorio Núm. 27, supra, el obrero peticionario acumuló un día y cuarto (1¼) por cada mes que tuviera ciento veinte (120) horas de labor. Esto equivale a un total de quince (15) días de vacaciones por año. Cada día por licencia de vacaciones equivale a ocho (8) horas de trabajo a razón de cinco dólares ($5) para un total de cuarenta dólares ($40) por día y cuarenta dólares ($40) por quince (15) días equivalen a seiscientos dólares ($600) por año. Así pues, el peticionario acumuló durante un período de cinco (5) años (desde febrero de 1989 hasta febrero de 1994) la cantidad de tres mil dólares ($3,000), más la suma de trescientos treinta y nueve dólares con cincuenta centavos ($339.50) comprendida en el período de marzo a septiembre de 1994 para un total de tres mil trescientos treinta y nueve dólares con cincuenta centavos ($3,339.50). A esta cantidad hay que añadirle una suma igual por concepto de penalidad según dispone la Sec. 30 de la Ley Núm. 96, supra, 29 L.P.R.A. sec. 246b. Véase, además: Opinión del Secretario Núm. 91-4, supra. Por lo tanto, la cuantía total por concepto de vacaciones asciende a seis mil seiscientos setenta y nueve dólares ($6,679). Erró

el foro de instancia al concederle al peticionario una cuantía de doce mil dólares ($12,000) por este concepto.[25]

Por los fundamentos antes expuestos, se dictará sentencia a los fines de modificar la emitida por el Tribunal de Circuito de Apelaciones, Circuito Regional de Arecibo y Utuado de 20 de marzo de 1996. En específico, se revoca su determinación de dejar sin efecto la anotación de rebeldía contra los recurridos. Se confirma la parte de la sentencia que modifica la cuantía por concepto de horas extras en cuanto dispone que el obrero peticionario tiene derecho al pago de catorce mil setecientos veinte dólares ($14,720).

En cuanto a lo resuelto exclusivamente por el Tribunal de Primera Instancia, Sala Superior de Arecibo, se dispondrá lo siguiente: Se modifican las cuantías otorgadas por concepto de mesada y de pago por vacaciones. Se confirma la determinación de que el obrero peticionario no tiene derecho al bono de navidad.

Se devuelve el caso a dicho tribunal para que dilucide si procede la reclamación por horas extras y horas para tomar alimentos durante el período del 15 de septiembre al 21 de octubre de 1993. Se ordena, además, que éste determine sí a tenor con lo resuelto en Marín v. Fastening Service Systems, Inc., supra, y Rivera v. Insular Wire Products, supra, la reclamación al amparo de la Ley Núm. 115, supra, debe tramitarse por la vía ordinaria o de acuerdo al procedimiento sumario de la Ley Núm. 2. Si concluye que procede el trámite sumario, deberá celebrar una vista en rebeldía, ya que las alegaciones de la querella no son suficientes para conceder el remedio solicitado.

---

[25] En su tercer y último señalamiento de error el peticionario alega, que incidió el Tribunal de Circuito al resolver que todos los recurridos contestaron la querella a pesar de que no existe en autos contestación alguna de la recurrida Nelva Avila, esposa del señor. Espinosa y ambos dueños de la Vaquería Espinosa.

En atención a lo ya discutido y a los documentos que obran en autos basta señalar, que al igual que a los demás recurridos, la señora Avila fue emplazada y notificada de la querella. Esta no compareció dentro del término de diez (10) días dispuesto por la Ley Núm. 2, supra. Por lo que, al igual que a los otros recurridos, se le anotó la rebeldía y se dictó sentencia en su contra.

MIRIAM NAVEIRA DE RODON
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Manuel Hernández Hernández

    Peticionario

       v.

                          AC-96-53

Angel Espinosa y otros

    Recurridos


SENTENCIA


San Juan, Puerto Rico, a 3 de abril de 1998


Por los fundamentos antes expuestos, se dicta sentencia los fines de modificar la emitida por el Tribunal de Circuit de Apelaciones, Circuito Regional de Arecibo y Utuado de 20 d marzo de 1996. En específico, se revoca su determinación d dejar sin efecto la anotación de rebeldía contra lo recurridos. Se confirma la parte de la sentencia que modific la cuantía por concepto de horas extras en cuanto dispone qu el obrero peticionario tiene derecho al pago de catorce mi setecientos veinte dólares ($14,720)

En cuanto a lo resuelto exclusivamente por el Tribunal d Primera Instancia, Sala Superior de Arecibo, se dispone l siguiente: Se modifican las cuantías otorgadas por concept de mesada y de pago por vacaciones. Se confirma l determinación de que el obrero peticionario no tiene derech al bono de navidad.

Se devuelve el caso a dicho tribunal para que dilucide s procede la reclamación por horas extras y horas para toma alimentos durante el período del 15 de septiembre al 21 d octubre de 1993. Se ordena, además, que éste determine sí tenor con lo resuelto en <u>Marín</u> v. <u>Fastening Servic Systems,</u>

Inc., supra, y Rivera v. Insular Wire Products, supra, la reclamación al amparo de la Ley Núm. 115, supra, debe tramitarse por la vía ordinaria o de acuerdo al procedimiento sumario de la Ley Núm. 2. Si concluye que procede el trámite sumario, deberá celebrar una vista en rebeldía, ya que las alegaciones de la querella no son suficientes para conceder el remedio solicitado

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. EL Juez Asociado señor Fuster Berlingeri está conforme con los acápites I, II, III, IV y la parte normativa del acápite VII de la opinión que antecede. Por otra parte, disiente sin opinión escrita en los acápites V, VI y en la parte dispositiva del acápite VII. El Juez Asociado señor Negrón García disiente con Opinión escrita. El Juez Asociado señor Rebollo López no intervino.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Manuel Hernández Hernández

    Recurrido-apelante

       v.                         AC-96-53        Apelación

Angel Espinosa y otros

    Peticionarios-apelados

Opinión Disidente del Juez Asociado señor Negrón García

San Juan, Puerto Rico, a 3 de abril de 1998

Hace más de tres y media décadas, al debatirse en la **Cámara de Representantes** el trámite especial y sumario de la Ley Núm. 2 de 17 de octubre de 1961, el Lcdo. Benjamín Ortiz Ortiz –experimentado jurista, ex-Juez Asociado de este Tribunal Supremo, a la sazón Presidente de la Comisión de lo Jurídico de dicho cuerpo–, **advirtió así el peligro potencial de percibir e interpretar inflexiblemente esa legislación:**

> "O sea, que queremos eliminar aquella situación del **patrono Goliat y el obrero David,** pero lo que no queremos es que por ley el obrero se convierta en **Goliat y el**

> **patrono en un David indefenso**, sin derechos, sin oportunidades de clase alguna. La actitud nuestra social no quiere decir que los patronos estén totalmente indefensos, digo, los patronos pueden tener razón y puede haber casos de justicia para los patronos, de modo que no vamos a llevar a otro extremo, que por defender a los obreros, destruyamos totalmente y reduzcamos a la insignificancia a los intereses patronales, o sea, **que el obrero no se convierta en el Goliat.**" Vol. 14, <u>Diario de Sesiones</u> (Sesión Extraordinaria), 29 de agosto de 1961, pág. 182. (Enfasis nuestro).

I

Los fundamentos jurídicos de la Sentencia del reputado Tribunal de Circuito de Apelaciones (Hons. Arbona Lago, Jiménez Muñoz y Salas Soler), reflejan un legítimo, pero fallido intento de remediar, vía interpretación,[26] el carácter **injusto y opresivo** de la Sentencia del ilustrado Tribunal de Primera Instancia, Sala Superior de Arecibo (Hon. Marcos T. Calderón Vázquez).

Este último, en su afán de hacer justicia, originalmente dejó sin efecto la anotación de rebeldía y procedió a señalar una vista. Después, ante el vehemente reclamo del obrero querellante Manuel Hernández

---

[26] Los querellados, esposos Angel Espinosa y Nelva Avila, en su petición de <u>certiorari</u> ante el Tribunal de Circuito de Apelaciones cuestionaron la anotación de rebeldía por una tardanza de cuatro (4) días y la validez de la sentencia dictada por el doble de la cuantía reclamada. Argumentaron que el Tribunal de Instancia había errado al no dejarla sin efecto.

La razón de decidir (<u>ratio decidendi</u>) del Tribunal de Circuito de Apelaciones fue otra: que los esposos Espinosa-Avila tenían quince (15) días para contestar y, por ende, no procedía la anotación y sentencia en rebeldía. Para ello, equiparó el concepto **distrito judicial** de la Ley Núm. 2 con el de **demarcación municipal**.

Distinto a lo concluido por dicho foro apelativo, los precedentes legislativos corroboran que **distrito judicial** se refiere a una demarcación territorial **más amplia, que de ordinario cubre varios límites municipales**.

Originalmente la Ley Núm. 10 de 14 de noviembre de 1917, enmendada por la Núm. 17 de 11 de abril de 1945, obligaba al querellado a comparecer por escrito en un término corto si residía dentro del **distrito municipal** donde se radicaba la querella. Posteriormente, la Ley Núm. 182 de 12 de mayo de 1948, introdujo la nomenclatura de **distrito judicial** con referencia a aquel en que se promovía la acción. Esta distinción y referencias a **distrito judicial** continuó a pesar de las enmiendas de la Ley Núm. 150 de 1 de mayo de 1950 y los cambios de la Ley de la Judicatura, Núm. 11 de 24 de Julio de 1952.

Después, en el 1961, la actual Ley Núm. 2, estableció que el querellado debería contestar dentro del término de diez (10) días si era notificado en el **distrito judicial** en que se promovía la acción, dándole quince (15) días si la notificación era en otra forma. La Ley Núm. 2 se refiere a las demarcaciones judiciales clásicas que existían a través de la evolución de nuestro ordenamiento jurídico, el Código Político (1902) y aquellas leyes, resoluciones conjuntas y órdenes administrativas del Tribunal Supremo subsiguientes, que identificaron y agruparon los municipios que integrarían los distritos judiciales. Bajo la primera Ley Orgánica de la Judicatura (1950), el término "distrito judicial" correspondió a las salas del entonces Tribunal de Distrito (después Superior), en contraste con el término "distrito judicial municipal". En virtud de la Ley de la Judicatura de 1952, las primeras se convirtieron en las Salas del Tribunal Superior y las Cortes Municipales en Salas del Tribunal de Distrito.

Ineludible concluir que en el 1961, al entrar en vigor la Ley Núm. 2, **los distritos judiciales** eran las demarcaciones territoriales correspondientes a las Salas del Tribunal Superior.

Estrictamente hablando, erró pues el Tribunal de Circuito de Apelaciones. Las citaciones realizadas en Camuy y Hatillo –municipios que forman parte del distrito judicial- (hoy región judicial) de Arecibo donde se presentó la querella, conllevó que los querellados Espinosa-Avila tenían diez (10) días para contestarla.

Hernández de que carecía de jurisdicción -en posible acatamiento de algunas decisiones que dan esa impresión-, reinstaló la rebeldía y dictó sentencia.

Ciertamente existen precedentes susceptibles de interpretarse como que sostienen la postura de que los tribunales no poseen discreción y siempre tienen que seguir ese curso de acción adjudicativo. Rivera v. Insular Wire Products Corp., res. en 24 de mayo de 1996; Mercado Cintrón v. Zeta Communications Inc., res. en 7 de abril de 1994; Resto Maldonado v. Galarza Rosario, 117 D.P.R. 458, 460 (1986). Ahora bien, nuestra jurisprudencia también informa casos bajo la Ley Núm. 2 en que hemos relevado de los efectos de una sentencia en rebeldía, con miras a que la querella se ventile en sus méritos. Román Cruz v. Díaz Rifas, 113 D.P.R. 500, 505 (1982); Díaz v. Hotel Miramar Corp., 103 D.P.R. 314 1975); Srio. del Trabajo v. Tribunal Superior, 91 D.P.R. 864, 866-867 (1965); Murphy Lugo v. Atl. So. Insurance Co., 91 D.P.R. 335 (1964). Durante nuestra incumbencia en este Tribunal, con vista a las circunstancias particulares de cada caso, hemos refrendado una u otra decisión. No obstante, en las circunstancias de autos, preferimos **ser criticados por inconsistentes a ser injustos.**[27]

La susodicha Sentencia, dictada en **rebeldía y sumariamente** bajo el trámite **especial** de la aludida Ley Núm. 2, condenó a los esposos Espinosa-Avila a satisfacer al querellante Hernández Hernández la suma de $200,100.00, su reinstalación al empleo, más $40.00 por **cada día transcurrido** desde el 4 de octubre de 1995, y una suma igual por concepto de penalidad, que ya sobrepasa $34,000.00. Este cuantioso dictamen (más de $234,000.00), se produce a pesar de que en la querella Hernández Hernández se limitó a solicitar la cantidad de $77,560.00.

**El mismo es resultado exclusivo de una tardanza de cuatro (4) días al presentarse en el Tribunal la contestación a la querella el viernes 17**

---

[27] Como dijimos, en Román Cruz v. Díaz Rifas, supra, "[n]o todos los casos son iguales; un determinado caso puede requerir un tratamiento distinto al que se le haya dado a otro, por más que éstos parezcan ser iguales". (Pág. 505).

**de noviembre de 1995, cuando vencía el lunes 13.**[28] Si dividiéramos el monto total de la sentencia entre estos cuatro (4) días, veremos que cada día de tardanza representa aproximadamente $58,500.00.

Contrasta paradójicamente esta demora procesal de cuatro (4) días, –que tiene visos de festinación legal– con el plazo de más de un (1) año (trescientos sesenta y cinco (365) días), que tardó Hernández Hernández en presentar y notificar su querella a los esposos Espinosa-Avila.

**Se trata de una actuación que de su faz pone en entredicho el derecho constitucional de los esposos Espinosa-Avila a un debido proceso de ley justo, igualitario y razonable.**

Aunque la Opinión mayoritaria modifica, lamentablemente convalida sustancialmente ese trámite en rebeldía y no logra superar esta grave **injusticia.**

En el caso de autos la aplicación **mecanicista** de la Ley Núm. 2 produce un estado de indefensión a la inversa: un desbalance procesal que ha convertido en **GOLIAT** al obrero Hernández Hernández y a su patrono, los esposos Espinosa-Avila, en el **DAVID. Enfrentan hoy una ruinosa sentencia en rebeldía, resultado de la aplicación absoluta y rigurosa de una matemática que le atribuye a una demora de cuatro (4) días, características sacramentales.**
**Exploremos una alternativa jurídica más justa.**

II

Sabido es que el preciado interés de la Legislatura de equiparar y proteger al obrero (históricamente parte más débil) frente al poderoso patrono, dio génesis a este procedimiento especial y sumario, "cuya característica principal es su rápida adjudicación". Díaz v. Hotel Miramar Corp., supra, 316.

Sin embargo, la Asamblea Legislativa, al redactar esta legislación especial conocía muy bien que su implantación podía generar sentencias en rebeldía injustas. Para superarlas y atemperar el rigor mecanicista del trámite sumario, facultó discrecionalmente a los tribunales –en virtud de moción jurada presentada **dentro del término fatal de sesenta (60) días de notificada la sentencia en rebeldía**–, a dejarla sin efecto al amparo del espíritu que inspira la Regla 49.2 de Procedimiento Civil "en casos de error, inadvertencia, sorpresa, **excusable negligencia,** fraude". Sec. 7, Ley Núm. 2. Díaz v. Hotel Miramar Corp., supra; Srio. del Trabajo v. Tribunal Superior, supra, 866-867 y Murphy Lugo v. Atl. So. Insurance Co., supra. **Salvo la voluntad judicial de hacerlo, ¿qué nos impide aplicar este justiciero mecanismo?** Veamos.

**Primero,** según indicamos, la contestación a la querella de los esposos Espinosa-Avila se presentó en la Secretaría del Tribunal de Instancia con una tardanza de **sólo cuatro (4) días. Segundo,** su presentación coincidió precisamente con la misma fecha en que el Tribunal de Instancia anotó la rebeldía. **Tercero,** el abogado de los querellados Espinosa-Avila, Lcdo. Eric Ronda Del Toro, diligentemente solicitó y

---

[28] Recuérdese que los esposos Espinosa-Avila fueron notificados el 2 de noviembre. Los diez (10) días vencieron el domingo 12, y el término se extendió hasta el referido lunes 13.

justificó a cabalidad su relevo en virtud de la Regla 49.2 de Procedimiento Civil, según aplica **limitadamente** a la Ley Núm. 2. Bajo juramento expuso hechos suficientes, configurativos de **"excusable negligencia"**, a saber: 1) recibió tardíamente la querella en sus oficinas en San Juan el jueves, 9 de noviembre; 2) la misma contenía distintas causas de acción y varias alegaciones sumamente **"ambiguas"**; 3) antes de contestarse responsablemente, tales alegaciones requirieron realizar una investigación de los hechos y derechos aplicables; y 4) ese mismo día, su hija tuvo que ser intervenida quirúrgicamente de emergencia en la Clínica Las Américas.

Repetimos, nadie ha cuestionado la veracidad y méritos de estas razones forenses y personales. **De hecho, la necesidad de una investigación previa para contestar la querella se pone de manifiesto en las ambigüedades de algunas de sus alegaciones.** Ello ha quedado demostrado por los **propios y complejos pronunciamientos[29] que en más de veinte (20) páginas la mayoría del Tribunal se ha visto forzada a hacer** en extremos tales como la acumulación de horas extras por razón de no habérsele permitido disfrutar el tiempo libre para ingerir alimentos; complicados cálculos para computar la indemnización; improcedencia de

---

[29] La situación es tan seria, que la mayoría del Tribunal ha tenido que reiterar la normativa expuesta en Marín Kuilan v. Díaz Fastening Systems, Inc., res. en 7 de febrero de 1997. En esa decisión, suscribimos una Opinión disidente; el Juez Asociado, Sr. Fuster Berlingeri emitió Opinión concurrente y disidente; y el Juez Asociado, Sr. Rebollo López no intervino. Se trata de un procedimiento mixto y bifurcado mediante el cual en una sola querella se fomenta que los tribunales otorguen algunos remedios, unos exclusivos o excluyentes en virtud del procedimiento sumario y, otros posibles remedios a través de la vía ordinaria.

Suponemos que la mayoría piensa que este **híbrido** permitirá a los tribunales del país cumplir con el espíritu del ordenamiento laboral, separando las distintas causas de acción, resolviendo algunas bajo el procedimiento sumario y las otras, aún cuando están dentro de la misma querella, por vía ordinaria. El propósito, aunque encomiable, crea múltiples complicaciones y cuestiones jurídicas no anticipables.

Así, en el caso de autos, de un lado, como los esposos Espinosa-Avila no contestaron a tiempo, la mayoría decide que procede la indemnización otorgada en rebeldía en el procedimiento sumario por despido injustificado (Ley Núm. 80). Sin embargo, simultáneamente resuelve que la reclamación bajo la Ley Núm. 115 puede tener que probarse en procedimiento ordinario. Preguntamos, ¿qué alcance tienen estos pronunciamientos? Específicamente, ¿a qué comparecencia tendrán derecho los esposos? Para la reclamación ordinaria, ¿se admitirá la contestación radicada cuatro (4) días tarde? ¿Subsistirá el pleito como un trámite en rebeldía clásico? En la vista evidenciaria, ¿se le permitirá a ellos estar presentes y por conducto de su abogado, contrainterrogar? ¿Podrán producir prueba a su favor? ¿Será "cosa juzgada" la determinación sumaria de que el despido fue injustificado o podrán controvertirla? Luego de oír la evidencia del querellante Hernández Hernández, ¿puede dicho Tribunal concluir que no hubo el despido o está obligado por el dictamen del trámite sumario? Estas y otras preguntas –y sus contestaciones adecuadas- son sumamente importantes; no pueden dejarse en el aire. Dependiendo de las respuestas que se brinden, estaremos o no frente a un trámite hueco, que complicará el procesamiento civil de casos de esta naturaleza.

la sentencia bajo la Ley Núm. 115 de 20 de diciembre de 1991, (despido discriminatorio por brindar información); y reclamación de horas extras por horarios fraccionados.[30] Tampoco se ha cuestionado la legitimidad y el peso de la razón personal aducida: ante la emergencia médica-quirúrgica de una hija, ¿a qué padre puede pedírsele que se despreocupe o la abandone para irse a investigar y contestar una demanda?

En resumen, sólo hacemos cumplida justicia dejando sin efecto la Sentencia en rebeldía, admitiendo la contestación y ordenando la celebración de una vista evidenciaria.

Evitemos, vía interpretación judicial rigurosa, conver-tir la Ley Núm. 2 en un estatuto **DRACONIANO.**

ANTONIO S. NEGRON GARCIA
Juez Asociado

---

[30] Preocupa el dictamen mayoritario alterno, esto es, si Hernández Hernández no prueba la reclamación bajo la Ley Núm. 115 o, la indemnización es menor, sea sólo acreedor a los derechos bajo la Ley 80. Ahora bien, si bajo la Ley Núm. 115 fuese mayor, deberá rebajarse la compensación ya concedida en virtud de la Ley Núm. 80.

**La dificultad de este enfoque alterno es que bajo la Ley Núm. 115, el obrero tiene derecho a la reposición en el empleo**. Si el remedio económico bajo la Ley Núm. 80 fuese mayor, ¿perdería su derecho a la reinstalación? ¿Podría el tribunal otorgarle **"lo mejor de ambas leyes"**? Ciertamente, no está claro si el obrero puede escoger el remedio con la indemnización menor o estamos ante una imposición judicial automática.