Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IX

| | | |
|---|---|---|
| KARLA GNOCCHI MARTÍNEZ<br><br>Recurrida<br><br><br>V.<br><br><br>MAPFRE PRAICO INSURANCE COMPANY, XYZ, INC.<br><br>Peticionaria | KLCE202400970 | Recurso de *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2023CV03927<br><br>Sobre: Despido Injustificado-Ley Núm. 80 del 30 de mayo de 1976; Discrimen por razón de impedimento-Ley 44 del 2 de julio de 1985 y ADA 42 U.S.C.A 12101 et seq.; Discrimen por razón de sexo-Ley Núm. 100 de 30 de junio de 1959 y Ley 69 de 6 de julio de 1985; Represalias-Ley Núm. 115 del 15 de diciembre de 1991<br><br>Procedimiento Sumario bajo la Ley Núm. 2 de 17 de octubre de 1961 |

Panel integrado por su presidente, el Juez Rodríguez Casillas, Juez Marrero Guerrero y Juez Campos Pérez.

Marrero Guerrero, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de enero de 2025.

Comparece MAPFRE Praico Insurance (en adelante, MAPFRE o Peticionaria) y solicita que revisemos una *Resolución* emitida el 27 de agosto de 2024 por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI). Mediante dicho dictamen, el foro primario denegó la *Moción de sentencia sumaria* presentada por MAPFRE y la *Oposición a Moción de Sentencia Sumaria y Solicitud para que se dicte Sentencia Sumaria Parcial a favor de la parte*

*querellante* presentada por la Sra. Karla Gnocchi Martínez (en adelante, señora Gnocchi Martínez o Recurrida).[1]

Tras evaluar el expediente ante nuestra consideración, adelantamos que *expedimos* el auto de *certiorari* y revocamos el proceder del foro primario. Explicamos.

**-I-**

El caso ante nuestra consideración tiene su génesis el 14 de julio de 2023 con la presentación de una *Querella*. En esta, la señora Gnocchi Martínez alegó despido injustificado bajo la Ley Núm. 80 del 30 de mayo de 1976, 29 LPRA §§ 185 (Ley Núm. 80-1976), discrimen por razón de impedimento al amparo de la Ley Núm. 44 del 2 de julio de 1985, y el Americans with Disabilities Act, 42 USCA 12101 et seq. (ADA), discrimen por razón de sexo al amparo de la Ley Núm. 100 de 30 de junio de 1959 (Ley Núm. 100-1959) y la Ley Núm. 69 de 6 de julio de 1985 (Ley Núm. 69-1985) y una alegación de represalias al amparo de la Ley Núm. 115 de 15 de diciembre de 1991 (Ley Núm. 115-1991) y del procedimiento sumario laboral que establece la Ley Núm. 2 de 17 de octubre de 1961, 32 LPRA §§ 3118 et seq. (Ley Núm. 2). La Recurrida sostiene, en síntesis, que sufrió represalias por solicitar acomodo razonable en su empleo.[2] En respuesta, el 31 de julio de 2023 MAPFRE presentó su *Contestación a la Querella.*[3]

Luego, el 3 de agosto de 2023 MAPFRE solicitó la conversión al procedimiento ordinario,[4] pero la Recurrida se opuso el 14 de agosto de 2023.[5] Así las cosas, el 18 de agosto de 2023, el TPI ordenó

---

[1] Apéndice del *Certiorari*, Apéndice I, págs. 1-8. Archivada y notificada en autos el 29 de agosto de 2024.
[2] *Íd.*, Apéndice V, págs. 1079-1094.
[3] *Íd.*, Apéndice VI, págs. 1095-1147.
[4] *Íd.*, Apéndice VII, págs. 1148-1156.
[5] *Íd.*, Apéndice VIII, págs. 1157-1163.

la continuación del trámite del caso bajo el procedimiento sumario laboral que establece la Ley Núm. 2-1961.[6]

Luego de varios trámites procesales y culminado el descubrimiento de prueba, el 28 de mayo de 2024 MAPFRE presentó una *Moción de Sentencia Sumaria*. Mediante esta, sostuvo que la Recurrida no estableció un caso *prima facie* de discrimen y que, de determinarse lo contrario, dicha parte renunció libre y voluntariamente a su empleo.[7]

Por otro lado, el 15 de julio de 2024 la Recurrida presentó una *Oposición a Moción de Sentencia Sumaria y Solicitud para que se dicte Sentencia Sumaria Parcial a favor de la parte Querellante*.[8] El 18 de julio de 2024 solicitó un desglose y sostuvo que la moción de sentencia sumaria presentada por MAFRE fue tardía,[9] pero el TPI denegó su solicitud.[10] Posteriormente, MAPFRE presentó su *Oposición a Solicitud de Sentencia Sumaria Parcial*.[11]

Sometido el asunto ante la consideración del foro primario, el 27 de agosto de 2024 el TPI emitió la *Resolución* recurrida.[12] En esta, enumeró los siguientes hechos incontrovertidos:

1. El 24 de febrero de 2004, la señora Gnocchi Martínez comenzó a trabajar para Mapfre.
2. La señora Gnocchi es Contadora Pública Autorizad[a].
3. La señora Gnocchi ocupó varios puestos en Mapfre, incluyendo varios de Vicepresidenta Auxiliar en Auditoría (2012), vicepresidenta de la nueva Unidad de Calidad, Control y Fraude (2015), y vicepresidenta del Área Técnica (2019).
4. Los vicepresidentes son oficiales de Mapfre, aparecen en los estatutos de la corporación, pueden firmar documentos de la compañía y representarla. Es un puesto de mayor relevancia.
5. En el año 2006 la señora Gnocchi fue ascendida de puesto de gerente, y desde esa fecha tenía una oficina, beneficios de "car allowance", aportación para el pago de la póliza de auto y teléfono corporativo.

---

[6] Apéndice del *Certiorari*, Apéndice IX, págs. 1164-1166. Archivada y notificada en autos el 22 de agosto de 2023.
[7] *Íd.*, Apéndice II, págs. 19-436.
[8] *Íd.*, Apéndice III, págs. 437-986.
[9] *Íd.*, Apéndice X, págs. 1167-1170.
[10] *Íd.*, Apéndice XI, pág. 1171.
[11] *Íd.*, Apéndice IV, pág. 987-1078.
[12] Apéndice del *Certiorari*, Apéndice I, págs. 1-8. Archivada y notificada en autos el 29 de agosto de 2024.

6. Durante el año 2014, la compañía comenzó a realizar cambios en la estructura organizacional, para tener una uniformidad en la jerarquía de los puestos gerenciales de Puerto Rico, con el fin de que estos se reportaran a la persona que contara con el mismo puesto en Mapfre en Estados Unidos y estos, a su vez, se reportaran a Mapfre en España.

7. En el año 2019 la Unidad de Fraude y la de Investigación se consolidaron, por lo que los empleados de la Unidad de Fraude dejaron de estar bajo la supervisión de la señora Gnocchi.

8. Efectivo el 1 de abril de 2019, la Querellante devengaba compensación anual total, por la cantidad de $113,177.00 (sic)[13] que incluía bonos por ejecutoria.

9. El Sr. Alexis Sánchez se reunió con la señora Gnocchi, para indicarle que, debido a que siguen homogenizando los procesos con España, en el sentido de dónde se reportan, la Unidad de Calidad se reportaría a la Unidad Operacional no bajo Contabilidad, donde la querellante se encontraba.

10. A la señora Gnocchi se le brindó la opción para que decidiera cuál área prefería dirigir en la Unidad de Calidad o la Unidad de Control Técnico.

11. El Sr. Ángel (sic) Sánchez[14] le informó a la Querellante que, si decidía continuar con la dirección de la Unidad de Calidad, iba a estar bajo la supervisión de la vicepresidenta Auxiliar, ya que no podrían coexistir dos puestos en el mismo rango de vicepresidenta.

12. La Querellante, a pesar de no estar de acuerdo con este cambio de puesto, no presentó ninguna queja, ante Recursos Humanos, pero sí ante el Sr. Ángel (sic) Sánchez.[15]

13. Al ocupar el puesto de vicepresidenta del Área Técnica en el año 2019, la señora Gnocchi dejó de supervisar empleados.

14. Entre las funciones de la señora Gnocchi como vicepresidenta del Área Técnica se encontraban: (1) dirigir proyectos especiales para análisis y reorganización de procesos y procedimientos para alienarlos con la misión y estrategias de Mapfre; (2) supervisar proyectos estratégicos del área técnica, evaluar su progreso y calidad; (3) darle seguimiento a los planes gerenciales y a las acciones correctivas, basado en los hallazgos de auditoría; (4) asistir a la alta gerencia a mejorar herramientas, técnicas y control para fortalecer el riesgo gerencial, basado en os hallazgos de auditoría; (5) revisar políticas y procedimientos para reducir el riesgo gerencial y la exposición de la compañía; e (6) implementar controles adicionales internos e identificar oportunidades para mejoras.

15. En algún momento entre el 2018 y el 2020, Mapfre Política Global de Jerarquización, en esta política se describían lo que serían las carreras técnicas.

---

[13] Surge de la prueba que la cantidad es $113,177.16.
[14] Debe decir Alexis Sánchez.
[15] Debe decir Alexis Sánchez.

16. El objetivo del plan de Mapfre era reducir la jerarquización, debido a que, en términos organizativos, el incremento de personal con capacidades de gestión, de toma de decisión, generaba dificultades de coordinación, el trabajo por silos y la falta de agilidad y flexibilidad.

17. Según el documento de política global, el plan se creaba para reducir la jerarquización; una de las estrategias que se implementó fue enfocarse en los mandos sin equipo.

18. Entre febrero y marzo 2022, hubo aproximadamente cuatro cambios, los primeros de conformidad con el proyecto o plan de jerarquización.

19. El 23 de enero de 2022, se llevó a cabo una actividad oficial entre los ejecutivos para jugar golf, en Río Grande, por motivo de la visita del presidente de Mapfre de España.

20. Luego de que los ejecutivos jugaran golf, se llevó a cabo un almuerzo en un restaurante, en Río Grande, en el que se invitaron a los vicepresidentes, incluyendo a la querellante.

21. La señora Gnocchi llevaba una falda pantalón sobre la rodilla y camisa blanca.

22. La Política de Vestimenta Profesional y Accesorios de Mapfre india en su inciso D de la página MAPFRE 0525, que dentro de la Vestimenta No Permitida se encuentra:

   10. Pantalones "Capri", "pesquero", a la rodilla, u otro modelo que no sea el pantalón tipo largo.

   11. Faldas que no cumplan con uno de estos estándares:
      a) holgada;
      b) cómoda en su caía;
      c) largo nunca estará por encima de donde comienza la rodilla.

23. Los participantes varones en la actividad estaban en pantalones cortos.

24. El señor De La Matta entiende que esa era la vestimenta correcta para la actividad.

25. La Lcda. Hilda Surillo, General Counsel Global se acercó a la señora Gnocchi y le comentó que su vestimenta no era la apropiada para una actividad profesional de trabajo.

26. Todos los empleados de Mapfre que jugaban golf ese día llevaban pantalones cortos.

27. Las demás féminas que asistieron a dicha actividad no utilizaron alguna vestimenta que su largo fuera más arriba de la rodilla.

28. La política de vestimenta de Mapfre indica que: "[s]alvo indicación en contrario, las normas de vestimenta aplican a actividades festivas".

29. El Sr. José A. De La [M]ata Bozzo (señor De La Mata) ocupa la posición de Vicepresidente Ejecutivo de Personas y Organización, Servicios Generales, Seguridad y Fundación desde hace cinco (5) años en Mapfre.

30. Antes de ocupar esa posición, el señor De La [M]ata durante ocho (8) años ocupó el puesto de vicepresidente senior con las mismas responsabilidades antes mencionadas.

31. El señor De La [M]ata declaró que "pose[e] un bachillerato en Administración Comercial con concentración en Contabilidad de la Universidad Católica de Ponce".

32. El 15 de febrero de 2022, el Sr. José De la Mata, junto con el [Sr.] Luis Negrón se reunieron con la Querellante. En dicha reunión, el señor De La Mata le informó a la señora Gnocchi que su puesto cambiaría a Experto(a) en Procesos y que sería trasladada del Área Técnica al Área de Operaciones.

33. Este cambio de puesto implicaba una baja de posición de la jerarquía de la empresa. La señora Gnocchi no estuvo de acuerdo con dicho cambio y se lo expresó a la alta jerarquía de Mapfre.

34. El señor De La mata reconoció que la alta jerarquía de Mapfre no tenía buena percepción de la señora Gnocchi, a pesar de sus buenas evaluaciones.

35. El último puesto ocupado por la señora Gnocchi fue el de Experto(a) en Procesos.

36. Como Experta en Procesos, en el Área de Operaciones, la señora Gnocchi pasó a estar bajo la supervisión de la Sra. Irtha Morales.

37. Como Experta en Procesos, en el área de Operaciones, la señora Gnocchi iba a estar delineando los procesos, evaluando, reuniéndose con demás personal, con el fin de hacer un flujograma de éstos y un entendimiento de éste. Además de identificar sus debilidades de control, acerca de doble funcionalidad o ineficiencia, esto con el fin de proponer la manera que estos podrían ser más eficientes.

38. La señora Gnocchi continuó devengando el mismo salario anual que recibía, mientras ocupó el puesto de Vicepresidenta de Control Técnico y bono por desempeño. (1) el "car allowance" se redujo de $975.00 mensual a $685.00 mensual, (2) se le eliminó su estacionamiento asignado, fuera del área reservada, (3) se le movería al 4to piso a un escritorio que designe su supervisor, (4) Mapfre dejó de asumir los costos de la renovación de la licencia de CIA, la membresía del IIA y la convención de CPA.

39. El señor De La [M]ata notificó a la Querellante que debía moverse al cuarto piso hacia otro espacio de trabajo asignado por su nuevo supervisor y su estacionamiento sería reasignado.

40. Desde el 11 de abril de 2022, en adelante, la querellante debía registrar su ora de entrada en el ponchador.

41. El Sr. José Zapata, quien ocupaba una posición de Vicepresidente Auxiliar de Mapfre, y no supervisaba empleados, efectivo el 1 de diciembre de 2022, se le cambió el nombre a su puesto a "DC Associate Director", permaneciendo con las mismas funciones.

42. El Sr. Saúl Arceo, quien ocupaba una plaza de Gerente, tampoco supervisaba empleados, sin embargo, aproximadamente, en el mes de marzo de 2022, lo trasladaron a la sucursal de San Juan, en la misma posición de Gerente, solo dejó de recibir el "car allowance".

43. El 21 de abril de 2022, la querellante le envió al señor De La Mata, un correo electrónico, mediante el cual incluyó una carta de la Dra. Marjorie Rodríguez,

en la que recomendó acomodo razonable para la Querellante.

44. Surge del Documento que la señora Gnocchi presentaba un diagnóstico de Trastorno por depresión mayor severo, episodio único, sin psicosis, desorden de ansiedad especificando y ataques de pánico.

45. Dicha solicitud de acomodo consistía en que la señora Gnocchi pueda mantenerse realizando sus labores en una oficina privada durante seis (6) meses, como período de transición y ajuste, donde la Sra. Gnocchi pueda procesar de manera adecuada los cambios presentados, adicionalmente a que tenía dificultad de concentración.

46. El 6 de junio de 2022, la compañía le envió a la Sra. Gnocchi la Descripción de Puesto de su puesto de Experto de Procesos. La señora Gnocchi había solicitado dicha descripción desde el 26 de enero de 2022 (sic).[16]

47. El 17 de junio de 2022, la querellante le expresó a su Psicóloga, la Dra. Marjorie Rodríguez que estuvo un poco deprimida, "porque una persona de esta que te ayudan a buscar empleo no me dio muchas esperanzas y eso me hizo sentir bien mal".

48. El 23 de junio de 2022, la compañía recibió un documento preparado y firmado por la Psicóloga Marjorie Rodríguez, indicando que la querellante tenía un diagnóstico desde el 16 de marzo de 2022 de un trastorno de depresión mayor severo, episodio único, sin psicosis, desorden de ansiedad específico y ataques de pánico, esto en referencia a la solicitud de acomodo razonable de la señora Gnocchi.

49. Surge además que, "aunque el proceso de recuperación en síntomas de Trastorno por Depresión Mayor, Desorden de Ansiedad y Ataques de Pánico pueden tener fin. No existe un tiempo específico esperado de recuperación, ya que al trabajo con los sentimiento[s] y emociones de un ser humano el tiempo esperado de un manejo de sintomatología puede variar".

50. Mediante correo electrónico, del 30 de junio de 2022, el señor De La Mata le informó a la Querellante que: "[d]ado que la petición original para moverte de escritorio fue hecha el 29 de marzo y ya han transcurrido tres meses desde esa fecha vamos a concederte un mes máximo para llevar a cabo tu movimiento, entiéndase el 29 de julio".

51. Mediante este correo electrónico, el señor De La Mata le respondió a la querellante que:

> En efecto, dicha comunicación sustituye nuestra posición en cuanto a su solicitud, aclarando que la misma no es una denegatoria, pues la petición original data del 29 de marzo de 2022 y usted se ha mantenido en su oficina todo este tiempo. Le confirmamos que, en atención y respuesta a su petición, la alternativa propuesta por la compañía es que se mantenga en su oficina hasta el 29 de julio de 2022. Las peticiones

---

[16] La señora Gnocchi había solicitado dicha descripción desde el 28 de abril de 2022.

de acomodo son procesos interactivos en los que el acomodo solicitado es evaluado y las empresas pueden proponer acomodos alternativos. En este caso, es la posición de la empresa conceder su solicitud hasta el 20 de julio de 2022, reconociendo que ya usted se ha mantenido en su oficina por tres meses.

52. Desde marzo hasta septiembre del 2022 la señora Gnocchi continuó trabajando en una oficina privada.

53. Mapfre no se reunió con la Querellante en ningún momento para explorar alguna otra alternativa de acomodo, ni para hablar sobre su solicitud de acomodo razonable. Solo le concedió tres (sic) meses.[17]

54. La Querellante fue asignada a un escritorio al lado de su supervisora la Sra. Irtha Morales.

55. El 16 de septiembre de 2022, la Querellante presentó un cargo, ante la Unidad Antidiscrimen del Departamento del Trabajo y Recursos Humanos, en la que alegó que fue discriminada, por razón de impedimento y sexo.

56. La señora Gnocchi expresó, entre varias razones, que en el tiempo que estuvo en su escritorio en el cuarto piso del edificio de la compañía, tenía muchas interrupciones, debido a que otros empleados dialogaban en el área de la fotocopiadora, lo cual afectaba su concentración.

57. La Querellante no le solicitó a su supervisora, la Sra. Irtha Morales, un cambio de escritorio con el fin de que no tuviera interrupciones y pueda concentrarse.

58. Durante su empleo la señora Gnocchi no tuvo amonestaciones escritas, ni suspensiones, ni se le colocó en algún plan de mejoramiento de desempeño.

59. La puntuación global obtenida por la Querellante como resultado de su evaluación de desempeño para el año 2018 fue "4", que significa "Excede las Expectativas".

60. La evaluación global obtenida por la señora Gnocchi como resultado de su evaluación de desempeño para el año 2019 fue "Cumple Consistentemente".

61. Para la evaluación del año 2019, la señora Gnocchi cumplió al 100 por ciento con los objetivos establecidos para ese año.

62. La evaluación de la Querellante correspondiente al año 2020 también fue una buena evaluación, obteniendo una puntuación en la "Medida General" de 4.35, lo cual según el nuevo método de evaluación en ese momento implantado por Mapfre era una buena evaluación, pues cumplía consistentemente con las metas de la empresa. Para la evaluación del año 2020, la querellante cumplió al 100 por ciento con los objetivos establecidos.

63. La evaluación de desempeño de la señora Gnocchi para el año 2021 fue "(3)", lo que significa "Cumple Consistentemente".

---

[17] Le concedió cuatro meses.

64. El 11 de octubre de 2022, la señora Gnocchi recibió una oferta de empleo, por parte de First Bank, para el puesto de "Assistant General Auditor".

65. Por recomendación médica del Psiquiatra Luis F. Acevedo Rodríguez, la querellante estuvo por Licencia de Enfermedad desde el 24 de octubre de 2022 hasta el 31 de octubre de 2022.

66. El 31 de octubre de 2022, mediante correo electrónico, la Sra. Gnocchi renunció a su empleo, según argumentó por el trato recibido. La renuncia era efectiva el 1 de noviembre de 2022.

67. En este momento, no existe el puesto de vicepresidente del Área Técnica, en Mapfre.

68. Alrededor de tres meses, previo a su renuncia, la Querellante solicitó empleo, en First Bank.

69. Luego de cuatro días de ser efectiva su renuncia en Mapfre, el 5 de noviembre de 2022, la querellante comenzó a trabajar para First Bank, en el puesto gerencial de "Assistant General Auditor", devengando un salario básico de ciento cinco mil dólares anuales ($105,000.00); bono por "performance", entre un ocho por ciento (8%) al quince por ciento (15%) del salario base, beneficio de Plan de Retiro 401K, entre otros.[18]

El foro primario identificó los siguientes hechos en controversia:

1. Si la renuncia de la señora Gnocchi se debió a un despido constructivo causado por las condiciones de trabajo creadas por Mapfre.
2. Si la Querellante fue objeto de discrimen por su sexo, condición de salud.
3. Si Mapfre se negó injustificadamente a ofrecer un acomodo razonable.
4. Si Mapfre trata distinto a sus gerenciales mujeres, comparado con sus gerenciales varones y de existir, si esto afect[ó] adversamente a la señora Gnocchi.
5. Si hubo represalias en contra de la señora Gnocchi, por esta haber presentado una querella, ante la Unidad antidiscrimen del Departamento del Trabajo y Recursos Humanos de Puerto Rico.
6. Si la señora Gnocchi fue despedida injustificadamente, por motivos de discrimen y en represalias a cuánto asciende el daño.[19]

Inconforme, el 9 de septiembre de 2024, MAPFRE acudió ante nosotros mediante el recurso de *Certiorari* e imputó la comisión de los siguientes errores:

1. Erró el Tribunal de Primera Instancia al determinar que existen controversias de hechos que impiden que se dicte sentencia sumaria a favor de la Peticionaria.
2. Erró el Tribunal de Primera Instancia al identificar las controversias que alegadamente impiden que se dicte sentencia sumaria a favor de la peticionaria como

---

[18] *Íd.*, Apéndice I, pág. 5-13.
[19] *Íd.*, Apéndice I, pág. 13-14.

controversias de hecho, en lugar de las controversias de derecho que debe resolver.

3. Erró el Tribunal de Primera Instancia al no determinar que en este caso no se configura una causa de acción válida de despido constructivo.

4. Erró el Tribunal de Primera Instancia al no determinar que en este caso no se configura una causa de acción válida de discrimen por sexo.

5. Erró el Tribunal de Primera Instancia al no determinar que en este caso no se configura una causa de acción válida de discrimen por impedimento.

6. Erró el Tribunal de Primera Instancia al no determinar que en este caso no se configura una causa de acción válida de represalias.

Por su parte, el 26 de septiembre de 2024, la Recurrida presentó un *Memorando en Oposición a Expedición de Auto de Certiorari*.

-II-

-A-

El *certiorari* es un recurso extraordinario cuya característica se asienta en la discreción encomendada al tribunal revisor para autorizar su expedición y adjudicar sus méritos. *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194, 207 (2023); *McNeil McNeil Healthcare v. Mun. Las Piedras I*, 206 DPR 391, 403-404, (2021); *800 Ponce de León v. AIG*, 205 DPR 163, 174 (2020), *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012). Este Tribunal tiene la obligación de ejercer prudentemente su juicio al intervenir con el discernimiento del TPI. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 97 (2008). Cabe precisar que el *certiorari* es el recurso de revisión disponible para revisar determinaciones post-sentencia.

Por su parte, la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, prescribe los criterios que debemos tomar en consideración al momento de determinar si expedimos o denegamos el auto solicitado:

A. Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

B. Si la situación de hechos planteada es la más indicada para el análisis del problema.

C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

De no estar presente algunos de estos criterios, corresponde abstenernos de expedir el auto de *certiorari.*

**-B-**

Es norma conocida que la sentencia sumaria "es un mecanismo procesal que posibilita la ágil disposición de casos sin la celebración de un juicio, siempre que no presenten controversias genuinas de hechos materiales". *Birriel Colón v. Econo y otro*, 2023 TSPR 120, 213 DPR ___ (2023); véase, además, *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 979 (2022); *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 334 (2021). A esos efectos, un hecho material es uno esencial, pertinente y que puede afectar el resultado de la reclamación conforme al derecho sustantivo aplicable. *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010); véase, además, Regla 36.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1. Además, la controversia sobre el hecho material debe ser real. *Ramos Pérez v. Univisión, supra.* En otras palabras, debe ser "de una calidad suficiente como para que sea necesario que un juez dirima a través de un juicio plenario . . .". *Íd.*

Cónsono con lo anterior, la Regla 36.3(e) de Procedimiento Civil, *supra*, R. 36.3 (e), establece que procede dictar una moción de sentencia sumaria "si las alegaciones, deposiciones, contestaciones a

interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente. . .". Véase, además, *Birriel Colón v. Econo y otro, supra*; *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).

Por otra parte, la parte que se opone a la solicitud de sentencia sumaria deberá refutar los hechos materiales que entienda están en disputa con evidencia sustancial. *Birriel Colón v. Supermercado Los Colobos, supra*; *SLG Fernández-Bernal v. RAD-MAN et al., supra*, págs. 336-337. Ahora bien, si la petición de sentencia sumaria está sustentada con declaraciones juradas u otra prueba, la parte que se opone no puede descansar en meras alegaciones, sino que deberá contestar de una forma tan detallada y específica como lo haya hecho la parte promovente. *Birriel Colón v. Econo y otro, supra*; *Ramos Pérez v. Univisión, supra*, pág. 215; Regla 36.3 (c) de Procedimiento Civil, *supra*, R. 36.3 (c). De lo anterior, incluso si no se presenta prueba para controvertir la evidencia presentada, ello no conduce a la concesión automática de una solicitud de sentencia sumaria. *Birriel Colón v. Econo y otro, supra*; *SLG Fernández-Bernal v. RAD-MAN et al., supra*, pág. 337.

Respecto a la oposición a una solicitud de sentencia sumaria, se sostiene, además que, la Regla 36.3 (b) de Procedimiento Civil, *supra*, R. 36.3 (b), establece que, "[l]a contestación a la moción de sentencia sumaria deberá ser presentada dentro del término de veinte (20) días de su notificación. . .". Por ello, "[s]i la parte contraria no presenta la contestación a la sentencia sumaria en el término provisto en esta regla, se entenderá que la moción de sentencia sumaria queda sometida para la consideración del tribunal". *Íd.*

Nuestro más alto foro estableció en *Meléndez González et al. v. M. Cuebas, supra*, págs. 117-119, el estándar específico que debemos

seguir como Tribunal de Apelaciones al momento de revisar denegatorias o concesiones de solicitudes de sentencia sumaria.

Primero, nos encontramos en la misma posición que el foro primario al momento de revisar las mociones de sentencia sumaria. *Íd.*, pág. 118. En otras palabras, se aplicarán los mismos criterios que la Regla 36 de Procedimiento Civil, *supra*, R. 36, le exige al foro *a quo*. Así pues, este Tribunal está llamado a llevar a cabo una revisión *de novo*. Sin embargo, no podemos tomar en consideración evidencia que las partes no presentaron ante el TPI, y debemos examinar el expediente de la forma más favorable hacia la parte que se opuso a la moción de sentencia sumaria, "llevando a cabo todas las inferencias permisibles a su favor". *Meléndez González et al. v. M. Cuebas, supra*, pág. 116.

Segundo y cónsono con lo anterior, al encontrarnos en la misma posición que el foro *a quo*, debemos revisar que tanto la petición de sentencia sumaria como su oposición cumplan con los requisitos de la Regla 36 de Procedimiento Civil, *supra*, y los discutidos en el caso de *SLG Zapata- Rivera v. J.F. Montalvo, supra; Meléndez González et al. v. M. Cuebas, supra*, pág. 118.

Tercero, nuestro Tribunal debe revisar si en realidad existen hechos materiales en controversia. Íd. De haberlos, debemos cumplir con la exigencia establecida en la Regla 36.4 de Procedimiento Civil, *supra*, R. 36.4, y exponer cuáles son los hechos materiales que están en controversia y cuáles son incontrovertidos. *Meléndez González et al. v. M. Cuebas, supra.*

Para que proceda la sentencia sumaria, no pueden existir controversias en cuanto a los hechos reales y sustanciales, por lo que lo único que debe hacer un tribunal es aplicar el derecho. En ocasión, las controversias de hechos se confunden con controversias de derecho. Es el deber de los tribunales diferenciar entre ambas. *Lugo Montalvo v. Sol Meliá Vacation,* 194 DPR 209, 226 (2015). El

Tribunal Supremo ha aclarado que "las determinaciones de hecho establecen qué fue lo que pasó, mientras que en las conclusiones de derecho se determina el significado jurídico de esos hechos conforme a determinada norma legal". *Íd.*

Cuarto y último, si este Tribunal determina que no existen hechos materiales en controversia, entonces procederemos a revisar si el TPI aplicó correctamente el derecho. *Íd.,* pág. 119.

**-C-**

Mediante la Ley Núm. 80-1976, *supra,* se protege a los empleados contra actuaciones arbitrarias del patrono disponiendo remedios económicos que desalienten despidos injustificados. *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co., supra,* pág. 770; *SLG Torres-Matundan v. Centro Patología,* 193 DPR 920, 929 (2015); *Romero v. Cabrer Roig,* 191 DPR 643, 649 (2014); *Feliciano Martes v. Sheraton, supra,* pág. 379. Este resarcimiento es conocido como la mesada y es un remedio exclusivo para aquellos empleados despedidos injustificadamente. *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co., supra,* pág. 772; *León Torres v. Rivera Lebrón,* 204 DPR 20, 37 (2020); *Lugo Montalvo v. Sol Meliá Vacation, supra,* págs. 230-231. Por ello, la Ley Núm. 80-1976, *supra,* tiene como propósito desalentar la práctica de despedir a empleados sin existir justa causa para ello, y proveerles a los empleados remedios ante daños causados por los despidos injustificados. *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co., supra,* pág. 772; *González Méndez v. Acción Social,* 196 DPR 213, 229 (2016).

Este estatuto incluye una lista taxativa de circunstancias que justifican un despido mediante justa causa. *Indulac v. Central General de Trabajadores, supra,* pág. 299; *González Santiago v. Baxter Healthcare of Puerto Rico,* 202 DPR 281, 292 (2019). Algunas de las instancias por las cuales se justifica el despido de un empleado son:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:
> **(a)** Que el empleado incurra en un patrón de conducta impropia o desordenada.
> **(b)** Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
> **(c)** Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
>
> . . . . Íd., sec. 185b.

Como norma general, la Ley Núm. 80-1976, *supra*, no favorece el despido como sanción ante una primera falta. *Indulac v. Central General de Trabajadores, supra*, págs. 299-300 (citando a *Secretario del Trabajo v. I.T.T.*, 108 DPR 536, 542-543 (1979)). No obstante, esta regla no es absoluta. *Indulac v. Central General de Trabajadores, supra*, pág. 300. Lo anterior pues, nuestro más alto foro ha resuelto que existen circunstancias en las cuales una sola ofensa o primera falta pudieran justificar un despido. Íd. Específicamente, nuestro máximo foro expresó:

> La falta o acto aislado que dé lugar a[l] despido del empleado en primera ofensa ha de ser de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría imprudencia esperar su reiteración para separarlo del establecimiento. *Secretario del Trabajo v. I.T.T., supra*, pág. 544.

Para propósito de la Ley 80, despido también abarca aquellas dirigidas a inducir o forzar al empleado a renunciar. El despido constructivo ocurre cuando al empleado se le obliga a renunciar al imponérsele condiciones de trabajo onerosas. Los actos voluntarios e injustificados de un patrono y dirigidos a obligar al empleado a renunciar constituyen despido cuando la única alternativa

razonable que le resta al empleado es abandonar su puesto. Cuando la conducta del patrono se base en vejámenes y humillaciones, estos deben ser de magnitud sustancial utilizándose un criterio objetivo al examinar si una persona razonable se sentiría forzada a renunciar como resultado de ellos. Lo decisivo es si por los actos del patrono señalados una persona razonable se puede sentir y en efecto se siente forzada a renunciar. Hasta tanto tal hecho no quede probado a satisfacción del tribunal, no se activará la presunción que la Ley Número 80 provee. *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894 (2011).

A modo de resumen, esta doctrina requiere: (1) uno o más actos voluntarios por parte del patrono; (2) que [e]stos estén motivados por una razón ajena al legítimo interés de salvaguardar el efectivo desempeño de la empresa o por una motivación que pueda calificarse como caprichosa, arbitraria e irrazonable; y, (3) que se cree una condición onerosa para el empleado que fuerce inevitablemente la renuncia a su puesto. *Figueroa Rivera v. El Telar*, 178 DPR 701, 711 (2010).

**-D-**

La Ley Núm. 2-1961, *supra,* establece un mecanismo especial para la rápida consideración y adjudicación de las querellas de empleados principalmente en casos sobre reclamaciones salariales y beneficios como la mesada por despido injustificado. *Pena Lacern v. Martínez,* 210 DPR 425, 434 (2022); *Santiago Ortiz v. Real Legacy Assurance Company, Inc.*, 206 DPR 194, 206-207 (2021); *Bacardí Corporation v. Torres Arroyo*, 202 DPR 1014, 1019 (2019). Para ello, la Asamblea Legislativa acortó términos y condiciones de la litigación civil en nuestra jurisdicción. *Pena Lacern v. Martínez, supra*, pág. 434; *Díaz Santiago v. Pontificia Universidad Católica de Puerto Rico*, 207 PR 339, 347 (2021); *León Torres v. Rivera Lebrón, supra*, pág. 31. Una de las condiciones modificadas en este tipo de tramite especial es que el

patrono ostenta "una sola alegación responsiva en la cual deberá incluir todas sus defensas y objeciones, <u>entendiéndose que renuncia a todas las defensas u objeciones que no incluya en dicha alegación responsiva</u>". *Véase*, Ley Núm. 2-1961, *supra*, sec. 3120 (énfasis suplido); *Pena Lacern v. Martínez*, *supra*, págs. 434, 435. A tenor con lo anterior, las Reglas de Procedimiento Civil, *supra*, aplicarán supletoriamente en todo aquello que no esté en conflicto con las disposiciones o con el carácter sumario de la Ley Núm. 2-1961, *supra*, sec. 3120; *Pena Lacern v. Martínez*, *supra*, pág. 435. Además, "[a]unque se ha reconocido la posibilidad de tener cierta flexibilidad ante las circunstancias extraordinarias que pueda presentar un caso en particular, en modo alguno se autoriza a los tribunales a soslayar el inequívoco y obligatorio precepto de rapidez en el trámite judicial estatuido en la Ley Núm. 2". *Pena Lacern v. Martínez*, *supra*, pág. 436.

**-E-**

La Ley Núm. 115-1991, *supra*, provee una protección empleados frente a represalias que tome un patrono contra estos por haber provisto testimonio, expresión o información en algún foro judicial legislativo o administrativo; véase, además, Íd., sec. 194 (a); *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 177 DPR 345, 361 (2011); *Feliciano Martes v. Sheraton*, supra, pág. 392; *Ocasio v. Kelly Servs.*, 163 DPR 653, 685 (2005). Cónsono con ello, se le otorga al empleado una causa de acción si, por realizar una actividad protegida, es despido, amenazado o discriminado en el empleo. *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, *supra*, pág. 361; *Rivera Prudencio v. Mun. San Juan*, 170 DPR 149, 159 (2007); *Cintrón v. Ritz Carlton*, 162 DPR 32, 37 (2004). Además, mediante la Ley Núm. 115-1991, *supra*, la Asamblea Legislativa creó una presunción de violación a este estatuto a favor de la querellante. *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, *supra*, pág. 361; *Marín v. Fastening*

*Systems, Inc.*, 142 DPR 499 (1997). Consecuentemente, el empleado puede probar la violación mediante evidencia directa o circunstancial, o establecer un caso *prima facie* de violación, tras evidenciar haber participado de una actividad protegida por la Ley Núm. 115-1991, *supra*, y consecuentemente, haber sido despedido, amenazado o discriminado. Íd., sec. 194b (c). Una vez establecido lo anterior, "el patrono deberá alegar y fundamentar una razón legítima y no discriminatoria para el despido". Íd. Si el patrono logra ello, el empleado debe demostrar que la razón alegada por el patrono realmente era un mero pretexto para el despido. Íd.; véase, además, *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico, supra*, pág. 362; *Feliciano Martes v. Sheraton, supra*, pág. 392; *Hernández v. Espinosa*, 145 DPR 248 (1998).

-**F**-

El Art. II, sec. 1 de la Constitución de Puerto Rico expresamente reconoce la dignidad e igualdad del ser humano como derechos fundamentales. A su vez, el referido artículo establece una prohibición constitucional contra el discrimen, la cual dispone que "[n]o podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas". Art. II, sec. 1, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 275. Como corolario de lo anterior, la Asamblea Legislativa ha creado varias leyes cuyo fin es extender las garantías constitucionales al ámbito laboral. Entre dichos estatutos se encuentra la antes citada Ley para Prohibir el Discrimen Contra las Personas con Impedimentos Físicos, Mentales o Sensoriales.

La Ley 44 de 2 de julio de 1985, 1 LPRA sec. 501 y siguientes, conocida como la Ley para Prohibir el Discrimen Contra las Personas con Impedimentos físicos, mentales o sensoriales, se adoptó con el objetivo de garantizar la igualdad en circunstancias en las cuales personas con discapacidad física, mental o sensorial enfrentan

tratos discriminatorios que limitan su oportunidad de participar, desempeñarse y competir adecuadamente en el campo laboral. *Guardiola Álvarez v. Dpto. de la Familia*, 175 DPR 668, 683 (2009). Esto es, dicho estatuto se aprobó con el fin de proteger a las personas con impedimentos físicos o mentales, para ampliar sus oportunidades de empleo y prohibir el discrimen en el empleo contra tales personas. *Ríos v. Cidra Mfg. Oper. Of P.R. Inc.*, 145 DPR 746, 749 (1998).

Para quedar cobijado por la Ley 44, el empleado tendrá que demostrar: (1) que es una persona con impedimento según lo define la ley, y (2) que está cualificado para llevar a cabo las funciones básicas de ese trabajo, con o sin el acomodo razonable. *García v. Darex P.R. Inc.*, 148 DPR 364 (1999).

Conforme estatuido, una "persona con impedimentos" significa, en lo pertinente:

> [T]oda persona con un impedimento de naturaleza motora, mental o sensorial, que le obstaculice o limite su inicio o desempeño laboral … y que está cualificada para llevar a cabo las funciones básicas de ese trabajo … con o sin acomodo razonable.
>
> **Se entenderá, además, que es una persona con impedimentos bajo la protección de este capítulo**, **toda aquella persona** cuyo impedimento le limite sustancialmente su desempeño en una o más actividades principales del diario vivir; **que** la persona tenga un historial previo de esa condición o **se le considere como que tiene dicho impedimento a[u]n cuando no lo tiene**.
> 1 LPRA sec. 501(d) (énfasis nuestro).

Esta definición de *impedimento* refleja aquella de la *Americans with Disabilities Act of 1990*, en adelante la ADA, por su acrónimo en inglés.[20] La tercera manifestación de discrimen contra una

---

[20] Esta definición de *impedimento* refleja aquella de la *Americans with Disabilities Act of 1990*, en adelante ADA, por su acrónimo en inglés. En particular, la sección 12102 de la ADA define impedimento (*disability*) respecto a una persona, de la siguiente forma:

> (A) **a physical or mental impairment that substantially limits one or more major life activities** of such individual;
>
> (B) a record of such an impairment; or
>
> (C) **being regarded as having such an impairment** (as described in paragraph (3)).

persona con impedimento que ambas leyes incluyen refiere al caso en que a una persona se le percibe como que tiene un impedimento. Distinto a la Ley 44, la ADA abunda sobre esta manifestación, que es la relevante para el caso de autos. En este sentido, para que una persona pruebe que se le está considerando como si tuviera un impedimento, la ADA dispone:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment[,] whether or not the impairment limits or is perceived to limit a major life activity.
> 42 U.S.C.A. sec. 12102(3)(A)

Según interpretaciones del Tribunal de Apelaciones del Primer Circuito y del Segundo Circuito federal, en los casos en que la persona alegue discrimen por ser considerada como que tiene un impedimento cuando, en realidad, no lo tiene, no basta probar que el patrono percibe al empleado como una persona impedida, sino que debe probarse que el patrono considera al empleado una persona impedida *conforme la definición provista en la ADA.*[21]

Además, el Tribunal Supremo de los Estados Unidos ha explicado que existen dos maneras en que la persona puede caer quedar protegida bajo la tercera manifestación de discrimen por impedimento. A saber, demostrando que el patrono: (1) Pensó incorrectamente que la persona tiene un impedimento físico que de hecho limita de manera significativa en por lo menos una actividad principal de vida, o (2) pensó incorrectamente que un impedimento que la persona sí tiene le limita de manera significativa en por lo

---

42 U.S.C.A. sec. 12102(1).

[21]Expresa el Primer Circuito en *Bailey v. Georgia-Pacific Corp.,* 306 F.3d 1162, 1169 (2002):

> Employee claiming that he is regarded as disabled cannot merely show that his employer perceived him as somehow disabled; rather, he must prove that employer regarded him as disabled within the meaning of the ADA.

*Íd.*, a la pág. 1169; reiterado en *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 176 (2003). Véase también *Giordano v. City of N.Y.*, 274 F.3d 740, 748 (2d Cir.2001).

menos una actividad principal de vida, cuando en realidad el impedimento no tiene ese impacto. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).[22]

*Sutton* también explica que, al proteger al empleado de discriminación basado en la impresión incorrecta del patrono de que la persona tiene un impedimento, el Congreso reconoció que los mitos y temores acumulados de la sociedad sobre las discapacidades y la enfermedad constituyen un impedimento tan patente como las limitaciones que surgen de un impedimento existente. *Íd.* El objetivo de dicho subinciso es cubrir y proteger a las personas que resultan rechazadas para un empleo debido a los mitos, temores y estereotipos asociados socialmente a la discapacidad. *Íd.* a las págs. 489–490.

**-G-**

La Ley Núm. 69 de 6 de julio de 1985, según enmendada, conocida como la *Ley para Garantizar la Igualdad de Derecho al Empleo* (Ley Núm. 69),[23] también prohíbe el discrimen por razón de sexo. La intención de esta legislación es "garantizar la igualdad de derecho al empleo tanto del hombre como de la mujer, prohibiendo las actuaciones de los que promueven el discrimen, fijando responsabilidades e imponiendo penalidades".[24] A tales fines, el Art. 3 de la Ley Núm. 69,[25] establece, como práctica ilegal en el empleo,

---

[22] En *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999):

> Under subsection (C), individuals who are "regarded as" having a disability are disabled within the meaning of the ADA. See [§ [12102(1)(C)]. [It] provides that having a disability includes "being regarded as having," § 12102[1](C), "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," § 12102[1](A). There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.

*Id.*, a la pág. 489.

[23] 29 LPRA sec. 1321 *et seq.*

[24] *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 813 (2009).

[25] 29 LPRA sec. 1323(1).

el que un patrono suspenda, rehúse emplear o despida a cualquier empleado por razón de su sexo.

**-H-**

Las protecciones conferidas al amparo de la antes referida Ley Núm. 100-1959, *supra*, se activan una vez el querellante establece *prima facie* que sufrió discrimen en su empleo. *Durieux Sepúlveda v. Conagra*, 169 DPR 269 (2004). Hay que destacar que esta presunción no tiene el propósito de facilitarle al empleado el probar sus alegaciones, por lo que no tiene el efecto de relevarle de la necesidad de presentar evidencia a su favor. *Íd.* Cónsono con lo anterior, nuestro Tribunal Supremo dispuso en *Hernández v. Trans Oceanic Life*, 151 DPR 754 (2000), que para demostrar que ha sido discriminado, un empleado debe establecer:

1. *Que hubo un despido o acto perjudicial.*
2. *Que este fue sin justa causa.*
3. *Que este acto perjudicial cae dentro de la modalidad de discrimen bajo la cual se reclama.*

Establecido esto, surgirá la presunción de que medió discrimen en el despido y el peso de la prueba recaerá en el patrono. Este último tendrá que demostrar que hubo justa causa para despedir al empleado. De lo contrario, cobra vigencia la presunción de discrimen del Art. 3 de la Ley 100-1959, 29 LPRA secc. 148, y se considerará que medió discriminación para el despido. El referido Artículo dispone:

> *Se presumirá que cualquiera de los actos mencionados en los Artículos precedentes fue cometido en violación de esta Ley, cuando el mismo haya sido realizado sin justa causa. Esta presunción será de carácter controvertible.*
> *No se presume que el patrono estaba enterado de la situación personal de algún empleado o empleada en los casos de discrimen a las víctimas o presuntas víctimas de violencia doméstica, agresión sexual o acecho, a no ser que en efecto el patrono hubiera estado en la posición de conocerlo.*
> *El patrono deberá realizar los ajustes o acomodos razonables necesarios en el lugar de trabajo para proteger a sus empleados y empleadas de un posible agresor(a) una vez este haya sido avisado sobre la potencialidad de que ocurra una situación peligrosa. El*

*no hacerlo se presumirá como una conducta discriminatoria. Art. 3 de la Ley 100-195, supra.*

**-III-**

En su primer y segundo señalamiento de error, MAPFRE sostiene que erró el TPI al determinar que existen controversias de hechos que impiden que se dicte sentencia sumaria y al identificarlas como controversias de hecho, en lugar de las controversias de derecho que debe resolver. Le asiste la razón.

Según esbozado, para que proceda la sentencia sumaria, no pueden existir controversias en cuanto a los hechos reales y sustanciales, por lo que lo único que debe hacer un tribunal es aplicar el derecho. Las controversias de hechos se podrían confundir con controversias de derecho, pero el Tribunal Supremo nos impone el deber de diferenciar entre ambas. *Lugo Montalvo v. Sol Meliá Vacation,* supra. Mientras las determinaciones de hecho establecen qué fue lo que pasó, las conclusiones de derecho determinan el significado jurídico de esos hechos conforme a determinada norma legal. *Íd.*

De la *Resolución* del foro primario surgían seis (6) controversias que fueron categorizadas como de hecho, cuando en realidad estas eran controversias de derecho. El TPI calificó como cuestiones de hecho las controversias jurídicas siguientes: (1) Si la renuncia de la señora Gnocchi se debió a un despido constructivo causado por las condiciones de trabajo creadas por Mapfre; (2) Si la Querellante fue objeto de discrimen por su sexo, condición de salud; (3) Si Mapfre se negó injustificadamente a ofrecer un acomodo razonable; (4) Si Mapfre trata distinto a sus gerenciales mujeres, comparado con sus gerenciales varones y de existir, si esto afect[ó] adversamente a la señora Gnocchi; (5) Si hubo represalias en contra de la señora Gnocchi, por esta haber presentado una querella, ante la Unidad antidiscrimen del Departamento del Trabajo y Recursos

Humanos de Puerto Rico; (6) Si la señora Gnocchi fue despedida injustificadamente, por motivos de discrimen y en represalias a cuánto asciende el daño. En todo caso debidamente instado ante un foro judicial habrá al menos una controversia de derecho presente y es precisamente esa controversia la que vienen los tribunales llamados a resolver.

En el caso ante nuestra consideración, ciertamente las controversias identificadas por el foro primario son controversias de derecho que debió haber adjudicado. Por tanto, procede resolverlas con los hechos materiales que se encontraron incontrovertidos a base de las mociones de las partes y de la prueba presentada. Como foro revisor, procedemos a hacerlo.

En su tercer señalamiento de error, la Peticionaria aduce que erró el TPI al no determinar que en este caso no se configura una causa de acción válida de despido constructivo. Recordemos que los actos voluntarios e injustificados de un patrono y dirigidos a obligar al empleado a renunciar constituyen despido cuando la única alternativa razonable que le resta al empleado es abandonar su puesto. Este no es el caso ante nos.

Estudiado el expediente ante nuestra consideración, no se cumplen los requisitos que requiere la doctrina de despido constructivo. La señora Gnocchi Martínez no logró establecer que los actos de MAPFRE estuvieran motivados por una razón ajena al legítimo interés de salvaguardar el efectivo desempeño de la empresa o por una motivación que pueda calificarse como caprichosa, arbitraria e irrazonable. Tampoco logró establecer que la Peticionaria creó una condición tan onerosa que la forzara a renunciar. *Figueroa Rivera v. El Telar*, supra.

La Recurrida fue cambiada de puesto a raíz de una nueva Política de Reducción de Jerarquización Global desarrollada a nivel corporativo. MAPFRE sostuvo que la decisión de la señora Gnocchi

Martínez de terminar su empleo fue el resultado de un ejercicio de selección de opciones, y no la única alternativa ante un ambiente de trabajo creado por el patrono tan insoportable que era inevitable su salida. Surge del expediente que meses antes de su renuncia, la señora Gnocchi Martínez había solicitado empleo en First Bank y obtenido una Oferta de Empleo mientras trabajaba todavía con MAPFRE. Además, admitió que empezó a trabajar cinco (5) días más tarde de su renuncia a MAPFRE.

Como cuarto y quinto señalamiento de error, MAPFRE arguye que erró el Tribunal de Primera Instancia al no determinar que en este caso no se configura una causa de acción válida de discrimen por sexo ni impedimento. Tiene razón. La señora Gnocchi Martínez no estableció *prima facie* que sufrió discrimen en su empleo. Para demostrar que ha sido discriminada, debió haber establecido que hubo un despido, que este fue sin justa causa y que este acto perjudicial cae dentro de la modalidad de discrimen bajo la cual se reclama.

MAPFRE determinó otorgarle el acomodo razonable alternativo a la señora Gnocchi Martínez, por un tiempo menor al solicitado. Sin embargo, la señora Gnocchi Martínez renunció voluntariamente a su empleo. No existe evidencia en el expediente que demuestre que se configuró una causa de acción válida de discrimen por sexo ni impedimento.

Finalmente, en su tercer señalamiento de error, la Peticionaria aduce que erró el Tribunal de Primera Instancia al no determinar que en este caso no se configura una causa de acción válida de represalias. También le asiste la razón. Aquí, la Peticionaria no logró establecer un caso *prima facie* de violación, tras evidenciar haber participado de una actividad protegida por la Ley Núm. 115-1991, *supra,* y consecuentemente, haber sido despedido, amenazado o discriminado. Íd., sec. 194b (c).

Aquí, la Recurrida presentó un cargo ante la Unidad Antidiscrimen del Departamento de Trabajo y Recursos Humanos en la que alegó que fue discriminada por razón de impedimento y sexo. No se quejó ante el Departamento de Recursos Humanos a pesar de que la compañía tenía una política de puertas abiertas. No surge del expediente que fuera objeto de amonestaciones escritas, cambio en su condición de empleo o salarios a raíz de su presentación de la Querella ante la Unidad Antidiscrimen.

Surge de la prueba presentada que MAPFRE le dio un acomodo alternativo razonable en respuesta a su impedimento. Se desprende también que la señora Gnocchi Martínez participó de actividades protegidas y renunció voluntariamente y solicitó otro empleo, tiempo después del incidente relacionado a su vestimenta supuestamente inapropiada en una actividad de trabajo.

Las alegadas controversias identificadas por el TPI son las cuestiones de derecho que el foro primario venía obligado a dirimir en este caso. Podían ser resueltas a la luz de los hechos que no están en controversia. Ejerciendo nuestra función revisora, concluimos que aquilatada la Moción de Sentencia Sumaria presentada por MAPFRE procedía declarar con lugar la misma y dictar Sentencia desestimando la Querella.

**-IV-**

Por los fundamentos que anteceden, *expedimos* el auto de *certiorari* y *revocamos* la determinación del TPI. En consecuencia, se ordena la desestimación de la Querella presentada por la recurrida.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones